*LARGE OIL CO. v. HOWARD,
State Auditor.

No. 8452—Opinion Filed Feb. 27, 1917.

(163 Pac. 537.)

(Syllabus by the Court.)

1. Taxation—Exemption—Agencies of Federal Government.

Agencies of the federal government are only exempt from state taxation so far as such taxation may interfere with or impair their efficiency in performing the functions by which they serve the government.

2. Same.

The exemption of federal agencies from state taxation is dependent, not upon the nature of the agents, or upon the mode of their constitution, or upon the fact that they are agents, but upon the effect of the tax; that is, upon the question whether the tax does in truth deprive them of power to serve the government as they were intended to serve it, or does hinder the efficient exercise of their power. A tax upon their property has no such necessary effect. It leaves them free to discharge the duties they have undertaken to perform. A tax upon their operations is a direct obstruction to the exercise of federal powers.

3. Same—Oil Company—Authority of Secretary of Interior—"Tax on Property"—State Statute.

The act of the Legislature of May 14, 1916 (Sess. Laws 1916, pp. 102-110), imposing a tax, "equal to three per centum of the gross value of the production of petroleum or other crude or mineral oil and of natural gas, less the royalty interest," and which provides that the payment thereof "shall be in full and in lieu of all taxes by the state, counties, cities, towns, townships, school districts and other municipalities upon any property rights attached to or inherent in the right to said minerals, upon leases for the mining * * * for petroleum or other crude oil or other mineral oil or for natural gas upon the mining rights and privileges for the minerals aforesaid belonging or appertaining to land, upon the machinery, appliances and equipment used in and around any well producing petroleum or other crude or mineral oil or natural gas * * * and actually used in the operation of such well; * * * and also upon the oil, gas, * * * during the tax year in which the same is produced, and upon any investments in any of the leases, rights, privileges, minerals or property hereinbefore in this paragraph mentioned or described"—is not subject to the objection that, because the business was carried on and the production brought about through the instrumentality of a federal agency, the state is without power to impose a tax. The tax is not upon the agency or the means employed by the producer, but upon the production of oil and gas, hence is a "tax on property" as such and is valid, without regard to the agency employed in its production.

---

*Appealed to the Supreme Court of the United States.

**4. Same—Mineral Leases — Indian Treaty Rights.**

Said act of the Legislature does not impose a tax upon the operations of the company, or upon its right to engage or continue in business, but upon the commodity which it produces, and which is made in full and in lieu of certain of its other property, and as a substitute therefor. It does not impair the treaty rights of the Osage Indians, for whom the federal government lawfully undertakes to act, and is too remote and indirect to be regarded as an interference with a federal agency, or a direct burden upon its free exercise.

**5. Same.**

The act does not purport to tax the lease or the investment therein or the rights or privileges appertaining thereto; nor does it in fact do so. The tax is payable upon the gross value of the oil and gas produced without regard to the value of the other enumerated property of the producer, in lieu of which the tax is imposed.

**6. Same—Constitutional Provisions—Amount —"Tax on an Ad Valorem Basis."**

The tax imposed is not, because of its amount, repugnant to section 9, art. 10, of the Constitution, providing that the state levy on an ad valorem basis shall not exceed in any one year 3½ mills on the dollar. While the tax is based upon the gross value of the production of oil and gas, it is not such a tax as is levied generally on property throughout the state on an "ad valorem basis," within the meaning and subject to the limitations of said section.

**7. Same—Special Tax—Production of Oil Company—Constitutional Provisions.**

The act imposes a special tax on oil and gas in lieu of and as a substitute for the general ad valorem tax on certain property of the producer, and is levied pursuant to sections 13 and 22, art. 10, of the Constitution, by which the state may select its subjects of taxation, and classify and value property so selected by means and methods different from that commonly employed in the assessment, levy, and collection of taxes by county and other municipal authorities.

Error from District Court, Oklahoma County; John W. Hayson, Judge.

Action by the Large Oil Company against E. B. Howard, Auditor of the State of Oklahoma. From a judgment sustaining a demurrer to plaintiff's petition and dismissing its cause of action, and for costs, plaintiff brings error. Affirmed.

Brennan, Kane & McCoy, John H. Burford, J. B. A. Robertson, and Roy Hoffman, for plaintiff in error.

S. P. Freeling, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for defendant in error.

SHARP, C. J. This case involves the important question of the power of the state to impose and collect the special tax provided for in chapter 39, Sess. Laws 1916, where the owner of the property sought to be taxed is engaged under authority of the Secretary of the Interior in the production of oil and gas in what formerly constituted the tribal lands of the Osage Nation of Indians in Oklahoma Territory, now Osage county, Okla. The question arises upon the sufficiency of the petition of plaintiff in error, to which the trial court sustained a demurrer.

Two grounds for a reversal of the judgment are urged: (1) That the act in question is an attempt to levy a privilege or occupation tax, and hence is invalid as to oil and gas produced through the operations of a federal agency; (2) that the oil and gas obtained or secured from lands within the Osage Nation is exempt from the operations of the tax imposed by said act of the Legislature. The two questions may properly be considered in the same connection.

It must be received as a postulate that the means or agencies provided or selected by the federal government, as necessary or convenient to the exercise of its functions, cannot be subjected to the taxing power of the state. This rule was announced in the leading case of McCullough v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, where the state of Maryland had imposed a tax upon an issue of notes by a branch bank of the United States, doing business in that state. The Bank of the United States was incorporated by Congress for the purpose of aiding in the fiscal operations of the government, and for the issuance of bank notes, to be used as currency. In declaring the tax unconstitutional, Chief Justice Marshall laid down the following principles, long since uncontroverted, and recognized as established law: That the taxing power of a state extends to every person and thing in its jurisdiction; that it does not extend to persons and things not within the state jurisdiction; that the government of the United States is supreme within its sphere; that in carrying out its enumerated powers the federal government has power to employ and create such agencies as it sees fit; that these agencies are not within the state jurisdiction (although operating in the state territory); and that to allow to the state any power to impede or burden by taxation the agencies of the federal government would be to allow them to nullify the powers granted to the federal government, since the power to tax involves the power to tax to the point of destruction, and by taxing the agencies of the federal power to that point the states would be able to defy and render nugatory the power it-

self. The limits of the decision, however, were carefully pointed out, and it was said that the rule announced did not deprive the states of any resources which they originally possessed; that it did not extend to a tax upon the real property of the bank, in common with other real property within the state, nor to a tax imposed on the interest which a citizen of Maryland might hold in the bank in common with other property of the same description throughout the state. On the general principle above stated, the states are precluded from taxing without federal permission United States bonds issued under the constitutional power of Congress to borrow money for governmental purposes, or the premium or excess above the value of such bonds; certificates of indebtedness issued for money or supplies; bills of credit issued for circulation; revenue stamps, issued by the federal government, and held by individuals; treasury notes issued and circulating as money; the salaries or emoluments of national officers; or the messages of the government sent by telegraph. On the other hand, the state may tax the property of federal agencies with other property in the state, and as other like property is taxed, when no law of Congress forbids, and when the effect of the taxation will not be to defeat or hinder the operations of the national government. A different rule, it has been well said, "would remove from the reach of state taxation all the property of every agent of the government." Thomson v. Union Pacific R. Co., 9 Wall. 579, 591, 19 L. Ed. 792. And the effect would be to embarrass and injure the state to the benefit of individuals, rather than of the nation. Union Pacific R. Co. v. Peniston, 18 Wall. 5, 21 L. Ed. 787.

It is not open to question that the plaintiff in error and a large number of the oil producers in this state, alike situated, are to be deemed and considered in the discharge of the functions imposed upon them by the general government as a federal agent or instrumentality, through which the government discharges its duty to a considerable class of the Indians of the state, including the Osage Indians. Choctaw, O. & G. R. Co. v. Harrison, 235 U. S. 292, 35 Sup. Ct. 27, 59 L. Ed. 234; Indian Territory Illuminating Oil Co. v. Oklahoma, 240 U. S. 522, 36 Sup. Ct. 453, 60 L. Ed. 779. The former case involved the gross revenue tax imposed by the act of May 26, 1908 (Sess. Laws 1907-08, pp. 640, 645), and which was designated by the court as an occupation or privilege tax, though the right of the state to levy and collect an ad valorem tax on the personal property of the lessee—the coal at the pit's mouth —was expressly recognized. The act under

review requires that the person, firm, association, or corporation, engaged in the mining or production of "petroleum or other crude oil or other mineral oil or of natural gas," shall make proper return thereof to the state auditor, and pay thereon, in quarterly periods, a sum equal to 3 per centum of the gross value of the production yielded during the preceding quarter annual period. The payment of the tax, the act provides—

" * * * shall be in full and in lieu of all taxes by the state, counties, cities, towns, townships, school districts and other municipalities upon any property rights attached to or inherent in the right to said minerals, upon leases for the mining * * * for petroleum or other crude oil or other mineral oil or for natural gas upon the mining rights and privileges for the minerals aforesaid belonging or appertaining to land, upon the machinery, appliances and equipment used in and around any well producing petroleum or other crude or mineral oil or natural gas * * * and actually used in the operation of such well; * * * and also upon the oil, gas, * * * during the tax years in which the same is produced; and upon any investment in any of the leases, rights, privileges, minerals or property hereinbefore in this paragraph mentioned or described."

Does the act impose an occupation or privilege tax, as was held to be the case under the 1908 statute, in Choctaw, O. & G. R. Co. v. Harrison, supra, or is it a property tax, or a tax imposed as a just equivalent thereof, or as a substitute therefor? Though possessing some of the characteristics of an occupation tax, the act in fact imposes a "property tax"; that is, a tax upon the gross value of the oil and gas produced during the preceding quarter-annual period, less the royalty interest. This appears from the following parts of the act, and from the history of the prior legislation and the decisions of the courts: (1) The amount of the tax is made dependent upon the gross value of the production, less the royalty interest; (2) the tax is imposed specifically as a substitute tax, and its payment is made in full and in lieu of all taxes by the state and municipal subdivisions thereof, upon any property rights attached to or inherent in the right to said minerals, and also upon the oil and gas during the tax year in which the same is produced; (3) the owner of the royalty pays the taxes thereon, and not the producer, as it was claimed was the case under the act of March 11, 1915 (Sess. Laws 1915, c. 107, art. 2, subd. "a," par. 1); (4) any interest in the land subject to taxation, other than that enumerated in the act, and oil in storage, produced and on hand at the date as of which property is assessed for general ad valorem taxation for any subsequent year, is assessed and taxed as other property of the taxing district; (5) delin-

quent taxes and the penalty accruing thereon are made a lien upon the property, assets, and funds of the producer, and may be recovered at the suit of the state; (6) the payment of the tax is not a condition of engaging in the business of mining, or of continuing therein; (7) the tax is not payable in respect to the privilege of engaging in or carrying on the business, but on the property introduced in commerce or reduced to possession according to its true value, and which is made a substitute for a tax on all the property by means of which it is produced; (8) it is provided that the State Board of Equalization may raise or lower the rates to make the same conform to the general ad valorem tax for all purposes on the property of the producer within the district, etc.; (9) the change in the statute law, and the decisions construing the act of May 26, 1908, and of March 11, 1915, considered, in connection therewith, evince a purpose to meet the objections found in the earlier acts of the Legislature.

Generally, it may be said that the value of the thing fixes the measure of the owner's ability to contribute in taxes toward the support of the government, and that taxes levied on the value of property have been the most commonly employed for raising the revenues of state government. Monticelli Distilling Co. v. Mayor, 90 Md. 416, 45 Atl. 210; Pullman Palace Car Co. v. Pennsylvania, 141 U. S. 18, 11 Sup. Ct. 876, 35 L. Ed. 613. In Smith's Wealth of Nations, book 4, c. 2, the author has enumerated certain maxims, among which are the following: (1) That the subjects of every state ought to contribute to the support of the government, as near as possible in proportion to the revenue which they respectively enjoy under its protection; (2) the tax which each is to pay ought, as respects the time and manner of payment, and the sum to be paid, to be certain and not arbitrary; (3) it ought to be levied at a time and in the manner in which it is most likely to be convenient to the contributor to pay it. The imposition of taxes is brought about in different ways by the state governments, and in this state may be brought about by different means or methods. Section 22, art. 10, Constitution. If the Legislature deems it wise to compound for all other taxes on a particular kind of business, difficult of taxation under the methods commonly pursued, by receiving a fixed part of the value of the gross production thereof, as a substitute for all taxes, it must be assumed by the courts that it was the legislative determination that the sum fixed was a proper equivalent for the taxes obtainable in a different mode and that it was a proper exercise of legislative power. This results, necessarily, from the legislative control over the subject of taxation, restrained only by constitutional requirements, obligatory alike on the Legislature and the courts. And where the particular plan of taxation, provided for by legislative wisdom, may be accounted for on the assumption of compounding or commuting for a just equivalent, or as a proper substitute, according to the determination of the Legislature, in the general scheme of taxation, it will not be condemned by the courts as violative of the Constitution. It will, of course, be conceded that the act of the Legislature contemplates and by its terms provides a different method of reaching and subjecting oil and gas to taxation, and fixing the rate thereof, from that prescribed by law for discovering and taxing property generally. The difficulty of determining the value of property of such character doubtless inspired the method adopted for its taxation. No complaint is made that the tax imposed is discriminatory, or that because of the amount it is unjustly oppressive. Were such the case, the act would seem to afford adequate relief, as it provides that the State Board of Equalization has the power, and it is its duty, either upon its own initiative, or upon complaint of any person who claims that he is taxed at too great a rate, to take testimony and determine whether the special tax levied is greater or less than the general ad valorem tax for all purposes, on the property of the producer subject to taxation in the district, including the value of oil, gas, leases, rights, machinery, equipment, or appliances, used in operation, and the minerals or any other element of taxable property, in lieu of which the taxes are levied, and conform the rates thereto. Provision is also made for an appeal from such action of the board to the Supreme Court.

On the other hand, the plaintiff in error directly challenges the authority of the state to levy any form of tax upon its property engaged in the business of producing oil and gas, and including the production. Such contention is manifestly without equity, and would, if successfully maintained by all those doing business in the state through the means of a federal agency, greatly embarrass the state in providing the necessary revenues for its government. The contention does not alone affect the state, but the rights of those who contribute to the burdens of maintaining the state government are involved, at least indirectly; for to permit a large part of the property within the state to escape taxation would place an unjust and disproportionate charge upon all other taxpayers not so situated, even though engaged in the identical business, and differing only in the matter of title or restrictions on the land on which the

oil and gas are produced. The federal government collects no taxes from the producers of oil and gas on restricted lands in this state; its only purpose and function in supervising and controlling the oil and gas industry within its control being the fulfillment of a duty imposed upon it by law toward a dependent people, to whom it occupies a relation of general guardianship. The plaintiff in error owes the federal government no duty by reason of its employment, except that arising out of the latter's relation to the Indians. It is a domestic corporation, engaged in a private enterprise, though operating under federal control as to departmental leases. It derives its corporate authority from the state, and carries on its business therein; its property receives the protection and benefit of state laws, and it freely avails itself of the open markets afforded in the state. It should therefore be required to contribute its just share in the expense incident to the state government, unless because of the nature of the tax the state is without power to impose it.

The principle involved, under statutes bearing more or less resemblance to the one at hand, has frequently been before and determined by the courts. In Attorney General v. Western Union Telegraph Co., 141 U. S. 40, 11 Sup. Ct. 889, 35 L. Ed. 628, it was held that the tax imposed by the statutes of Massachusetts, requiring every telegraph company, owning a line of telegraph within the state, to pay to the state treasurer, "a tax upon its corporate franchise at a valuation thereof equal to the aggregate value of its shares of stock," deducting such portion of that valuation as was proportional to the length of its line without the state, and also deducting an amount equal to the value of its real estate and machinery, subject to local taxation within the state, was in effect a tax upon the corporation on account of the property used by it within the state, and was constitutional and valid as applied to a telegraph company incorporated by another state, and which had accepted the rights conferred by Congress through section 5263, Rev. Stats. (Comp. St. 1913, sec. 10072). In arriving at this conclusion, Western Union Telegraph Co. v. Attorney General, 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790, was made the basis of the decision, and the following propositions affirmed in that case were reiterated by Mr. Justice Gray, delivering the opinion of the court:

"The franchise of the company to be a corporation, and to carry on the business of telegraphing, was derived not from the act of Congress, but from the laws of the state of New York, under which it was organized; and it never could have been intended by the Congress of the United States, in conferring upon a corporation of one state the authority to enter the territory of another state, and to erect its poles and lines therein, to establish the proposition that such a company owed no obedience to the laws of the state into which it thus entered, and was under no obligation to pay its fair proportion of the taxes necessary to the support of the government of that state. 125 U. S. 547, 548 [8 Sup. Ct. 961] 31 L. Ed. 792, 793. By whatever name the tax may be called, as described in the laws of Massachusetts, it is essentially an excise upon the capital of the corporation; and those laws attempt to ascertain the just amount which any corporation engaged in business within its limits shall pay as a contribution to the support of its government upon the amount and value of the capital so employed by it therein. * * * The tax, though nominally upon the shares of the capital stock of the company, is in effect a tax upon that organization on account of property owned and used by it in the state of Massachusetts; and the proportion of the length of its lines in that state to their entire length throughout the whole country is made the basis for ascertaining the value of that property. Such a tax is not forbidden by the acceptance on the part of the telegraph company of the rights conferred by section 5263 of the Revised Statutes, or by the commerce clause of the Constitution. * * * The statute of Massachusetts is intended to govern the taxation of all corporations doing business within its territory, whether organized under its own laws or under those of some other state; and the rule adopted to ascertain the amount of the value of the capital engaged in that business, within its boundaries, on which the tax should be assessed, is not an unfair or unjust one; and the details of the method by which this was determined have not exceeded the fair range of legislative discretion."

In Pullman Palace Car Co. v. Pennsylvania, 141 U. S. 18, 11 Sup. Ct. 876, 35 L. Ed. 613, the rule was announced that a tax, not upon the property employed in the business of interstate commerce, but upon the right to carry on the business at all, imposed a direct burden upon the commerce itself. But it was said that a tax upon the capital of a corporation, on account of its property within the state, was in substance and effect a tax on that property; and that even though the cars of the company within the state were employed in interstate commerce, their being so employed did not exempt them from taxation by the state. In Cleveland, C., C. & St. L. R. Co. v. Backus, 154 U. S. 439, 14 Sup. Ct. 1122, 38 L. Ed. 1041, after referring to the difficulty, if not the impossibility, of certain methods of taxing the property of the railroad company, the court, speaking through Mr. Justice Brewer, said:

"Either the property must be declared wholly exempt from state taxation, or taxed

at its value, irrespective of the causes and uses which have brought about such value. And the uniform ruling of this court, a ruling demanded by the harmonious relations between the states and the national government, has affirmed that the full discharge of no duty intrusted to the latter restrains the former from the exercise of the power of equal taxation upon all private property within its territorial limits. All that has been decided is that, beyond the taxation of property, according to the rule of ordinary property taxation, no state shall attempt to impose the added burden of a license or other tax for the privilege of using, constructing, or operating any bridge, or other instrumentality of interstate commerce, or for the carrying on of such commerce. It is enough for the state that it finds within its borders property which is of a certain value. What has caused that value is immaterial. It is protected by state laws, and the rule of all property taxation is the rule of value, and by that rule property engaged in interstate commerce is controlled the same as property engaged in commerce within the state. Neither is this an attempt to do by indirection what cannot be done directly; that is, to cast a burden on interstate commerce. It comes rather within that large class of state action, like certain police restraints, which, while indirectly affecting, cannot be considered as a regulation of interstate commerce, or a direct burden upon its free exercise."

In Postal Telegraph Cable Co. v. Adams, 155 U. S. 688, 15 Sup. Ct. 268, 360, 39 L. Ed. 311, after stating it was settled that where by way of duties laid on transportation of subjects of interstate commerce, or on the receipts derived therefrom or on the occupation or business of carrying it on, a tax was levied by a state on interstate commerce, such taxation amounted to a regulation of such commerce, and could not be sustained. The court proceeding further, however, and addressing itself to the right of the state to tax the property of a corporation engaged in foreign or interstate commerce, said:

"But property in a state belonging to a corporation, whether foreign or domestic, engaged in foreign or interstate commerce, may be taxed, or a tax imposed on a corporation on account of its property within a state, and may take the form of a tax for the privilege of exercising its franchises within the state, if the ascertainment of the amount is made dependent in fact on the value of its property situated within the state (the exaction therefore not being susceptible of exceeding the sum which might be leviable directly thereon), and if payment be not made a condition precedent to the right to carry on the business, but its enforcement left to the ordinary means devised for the collection of taxes. The corporation is thus made to bear its proper proportion of the burdens of the government under whose protection it conducts its operations, while interstate commerce is not in itself subjected to restraint or impediment."

The court further held that no state could add to the taxation of property, according to the rule of ordinary property taxation, the burden of a license or other tax on the privilege of using, constructing, or operating an instrumentality of interstate or of international commerce, or for the carrying on of such commerce. But it was said, as the value of property results from the use to which it is put, and varies with the profitableness of that use, whatever name the exaction may be called, if it amounts to no more than the ordinary tax upon property, or the just equivalent therefor, ascertained by reference thereto, it is not open to attack as inconsistent with the Constitution. The opinion calls attention to the opinion of the Supreme Court of Mississippi, in Vicksburg Bank v. Worrell, 67 Miss. 47, 7 South. 219, and to the decision of that court in the case at bar (Postal Telegraph Cable Co. v. Adams, 71 Miss. 555, 14 South. 36, 42 Am. St. Rep. 476), where, after quoting from the opinion of the state court in the latter case, it was said:

"This exposition of the statute brings it within the rule where ad valorem taxes are compounded or commuted for a just equivalent, determined by reference to the amount and value of the property. Being thus brought within the rule, the tax becomes substantially a mere tax on property and not one imposed on the privilege of doing interstate business. The substance and not the shadow determines the validity of the exercise of the power."

It was also said that the tax was neither arbitrary nor discriminating; nor, so far as the court was advised, was payment made a condition to doing business, but that collection was enforceable by suit, and the remedies appertaining thereto, and not otherwise. In that case, according to the opinion, the tax was graduated according to the amount and value of the property, measured by miles, and was in lieu of taxes levied directly on the property. In concluding the opinion the court said:

"In marking the distinction between the power over commerce and municipal power, literal adherence to particular nomenclature should not be allowed to control construction in arriving at the true intention and effect of state legislation. We are of opinion that it was within the power of the state to levy a charge upon this company in the form of a franchise tax but arrived at with reference to the value of its property within the state and in lieu of all other taxes, and that the exercise of that power by the statute, as expounded by the highest judicial tribunal of the state in the language we have quoted, did not amount to a regulation of interstate commerce or put an unconstitutional restraint thereon."

In United States Express Co. v. Minnesota, 223 U. S. 335, 32 Sup. Ct. 211, 56 L. Ed. 459, it was said that the right of the state to tax property, although it is used in interstate commerce, was thoroughly settled, but that the difficulty was to distinguish between legitimate attempts to exert the taxing power of the state and those laws which, though in the guise of taxation, imposed real burdens upon interstate commerce as such. The court then quotes from its former opinion in Maine v. Grand Trunk R. Co., 142 U. S. 217, 12 Sup. Ct. 121, 163, 35 L. Ed. 994, in which it said:

"By whatever name the exaction may be called, if it amounts to no more than the ordinary tax upon property or a just equivalent therefor, ascertained by reference thereto, it is not open to attack as inconsistent with the Constitution."

And in construing the statute before it, said that it was to look for a practical, rather than a logical or philosophical, distinction. After referring to the decision of the state Supreme Court (State v. United States Express Co., 114 Minn. 346, 131 N. W. 489, 37 L. R. A. [N. S.] 1127), and the statute under which the tax was assessed, which provided that the same "shall be in lieu of all taxes upon the property" (Rev. Laws Minn. 1905, sec. 1019), it was said that the statute furnished the only mode prescribed by the state for exercising the authority of the state to tax the property of express companies within its jurisdiction. Attention was called to the fact that, if the same was not taxed by that method, the property was not taxed at all. It was observed that all property of express companies, being much of it of an intangible character, was difficult to reach and properly classify for taxation, as was the case in Adams Express Co. v. Ohio, 165 U. S. 194, 17 Sup. Ct. 305, 41 L. Ed. 683. Finally, that the case came within the rule announced in Postal Telegraph Cable Co. v. Adams, 155 U. S. 688, 15 Sup. Ct. 268, 360, 39 L. Ed. 311; and after noting that there was no suggestion in the record that the amount of the tax was unduly great, having reference to the real value of the property of the company within the state and the assessment made, in conclusion said:

"Upon the whole, we think the statute falls within that class where there has been an exercise in good faith of a legitimate taxing power, the measure of which taxation is in part the proceeds of interstate commerce, which could not in itself be taxed, and does not fall within that class of statutes uniformly condemned in this court, which show a manifest attempt to burden the conduct of interstate commerce."

The power of a state to tax instrumentalities of interstate commerce, or the agencies through which such commerce is carried on, involves the same general principle as the authority of the state to tax the instrumentalities or agencies through which the federal government discharges its obligations to Indians, and to Indian tribes, in the management of their property, and the protection of their property rights. The state may tax the property of either agency situated within its territorial jurisdiction, but may not impose any further burdens thereon by way of occupation or license tax.

In the instant case, the tax is imposed upon the amount of petroleum or other crude or mineral oil, and of natural gas (less the royalty interest), according to its actual gross value at the place of production. The return to the State Auditor, made by the producer, does not require that it shall include the other property of the producer, in lieu of which the tax is imposed. Neither does the act purport to tax the lease or the mining rights or privileges, or any investments therein. Both the tax imposed, and the statement rendered, include only the oil and gas produced, which is the only property of the producer upon which the special tax is imposed. Instead of taxing the other property of the producer engaged in or that contributes to the production, the tax is imposed, not upon it or on the basis of its value, but upon the gross value of the oil and gas. This is true without regard to the value of the property or mining rights, leases, privileges, machinery, appliances, and equipment used in and around any producing well. In other words, the tax is paid upon the oil and gas produced, and upon it alone, without regard to the value of the "other" property. The lease, through which the rights or privileges are secured, furnishes only the evidence of title or ownership, and not a subject of taxation. In such circumstances, it cannot be said that the act goes further than to levy a tax on the actual cash value of the oil and gas at the place of production, "in full and in lieu of all taxes." by the state and its municipal subdivisions, upon any property rights (including leases), named therein.

There is, however, a line of decisions of the Supreme Court of the United States. even more directly in point than those to which attention has been directed, and which seem to set at rest any doubt as to the power of the state to impose upon the property of a federal agency a tax such as that at hand. In Thomson v. Union Pacific R. Co., 9 Wall. 579. 19 L. Ed. 792, the argument was made by the railroad company that as the road was being constructed under the direction and authority of Congress, for the uses and purposes of the United States, and being a part of a system of roads thus constructed,

it was therefore exempt from taxation under state authority, though the exemption was not claimed under any act of Congress. The insistence was that the right of exemption arose from the relation of the road to the general government, and it was urged that the aids granted by Congress to the roads were given in the exercise of its constitutional power to regulate commerce, to establish post offices and post roads, and to raise and support armies, and suppress insurrection and invasion; and that by the legislation which supplied aid, required security, imposed duties, and finally enacted, under certain contingencies, a percentage of income, the road was adopted as an instrument of the government, and as such was not subject to taxation by the state. The case of McCullough v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, was much relied on in support of this position. After reviewing at some length the opinion of Chief Justice Marshall in the last-named case, and other opinions of the Supreme Court, it was said:

"In all these cases, as in the case of the Bank of the United States, exemption from liability to taxation was maintained upon the same ground. The state tax held to be repugnant to the Constitution was imposed directly upon an operation or an instrument of the government. That such taxes cannot be imposed on the operations of the government is a proposition which needs no argument to support it. And the same reasoning will apply to instruments of the government, created by itself for public and constitutional ends. But we are not aware of any case in which the real estate or other property of a corporation not organized under an act of Congress, has been held to be exempt, in the absence of express legislation to that effect, to a just contribution, in common with other property, to the general expenditure for the common benefit, because of the employment of the corporation in the service of the government."

Attention was called to the fact that, even in respect to corporations organized under the legislation of Congress, the court had held (First Nat. Bank of Louisville v. Kentucky, 9 Wall. 353, 19 L. Ed. 701; Lionberger v. Rowse, 9 Wall, 468, 19 L. Ed. 721) that the implied limitation upon state taxation, derived from the express permission to tax shares in the national banking corporations, was to be so construed as not to embarrass the imposition or collection of state taxes to the extent of the permission fairly and liberally construed. Further, it was said that the court did not feel warranted in extending the exemption established by the case of McCullough v. Maryland beyond its terms, and, in additional reference to said case, said:

"We cannot apply it to the case of a corporation deriving its existence from state law, exercising its franchise under state law, and holding its property within state jurisdiction and under state protection. We do not doubt the propriety or the necessity, under the Constitution, of maintaining the supremacy of the general government within its constitutional sphere. We fully recognize the soundness of the doctrine that no state has a 'right to tax the means employed by the government of the Union for the execution of its powers.' But we think there is a clear distinction between the means employed by the government and the property of agents employed by the government. Taxation of the agency is taxation of the means; taxation of the property of the agent is not always, or generally, taxation of the means."

Further, it was said that no one questions that the power to tax, all property, business, and persons, within their respective limits, is originally in the states, and had never been surrendered. It could not be so used as to defeat or hinder the operations of the national government; but it would be safe to conclude, in general, in reference to persons and state corporations in government service, that, when Congress has not interposed to protect their property from state taxation, such taxation is not obnoxious to that objection. Finally, it was said:

"We perceive no limits to the principle of exemption which the complainants seek to establish. It would remove from the reach of state taxation all the property of every agent of the government. Every corporation engaged in the transportation of mails, or of government property of any description, by land or water, or in supplying materials for the use of the government, or in performing any service of whatever kind, might claim the benefit of the exemption. The amount of property now held by such corporations, and having relations more or less direct to the national government and its service, is very great. And this amount is continually increasing; so that it may admit of question whether the whole income of the property which will remain liable to state taxation, if the principle contended for is admitted and applied to its fullest extent, may not ultimately be found inadequate to the support of the state governments."

In Union Pacific R. Co. v. Peniston, 18 Wall. 5, 21 L. Ed. 787, the property of the Union Pacific Railroad Company, although the corporation was created by Congress, and the company was an agent of the general government, designed to be employed and actually employed in the legitimate service of the government, both military and postal, was held not exempt from state taxation. After referring to the decision in Thomson v. Union Pacific R. Co., supra, it was observed that it might be considered as settled that no constitutional implications prohibit a state tax upon property of an agent of the

government, merely because it is the property of such an agent, and that a contrary doctrine would greatly embarrass states in the collection of their necessary revenues, without any corresponding advantage to the United States. And it was said that a very large portion of the property within the states was employed in the execution of the powers of the government; that such property belonged to governmental agents, and was not only used, but that it was necessary for their agencies. United States mails, troops, and munitions of war, were carried upon almost every railroad; telegraph lines were employed in the national service; so were steamboats, horses, stagecoaches, foundries, shipyards, and multitudes of manufacturing establishments. They are the property of natural persons or of corporations, who are instruments or agents of the general government, and they are the hands by which the objects of the government are attained. But that, if they were exempt from liability to contribute to the revenue of the states, it was manifest that state governments would be paralyzed. While it was of the utmost importance that all the powers vested by the Constitution of the United States in the general government should be preserved in full efficiency, it had never been decided that state taxation of such property was impliedly prohibited. Inter alia, the court said:

"All state taxation which does not impair the agent's efficiency in the discharge of his duties to the government has been sustained when challenged, and a tax upon his property generally has not been regarded as beyond the power of a state to impose. * * * It is therefore manifest that exemption of federal agencies from state taxation is dependent, not upon the nature of the agents, or upon the mode of their constitution, or upon the fact that they are agents, but upon the effect of the tax; that is, upon the question whether the tax does in truth deprive them of power to serve the government as they were intended to serve it, or does hinder the efficient exercise of their power. A tax upon their property has no such necessary effect. It leaves them free to discharge the duties they have undertaken to perform. A tax upon their operations is a direct obstruction to the exercise of federal powers. In this case the tax is laid upon the property of the railroad company precisely as was the tax complained of in Thomson v. Railroad Co. It is not imposed upon the franchises or the right of the company to exist and perform the functions for which it was brought into being. Nor is it laid upon any act which the company has been authorized to do. It is not the transmission of dispatches, nor the transportation of United States mails, or troops, or munitions of war that is taxed, but it is exclusively the real and personal property of the agent, taxed in common with all other property in the state of a similar character. It is impossible to maintain that this is an interference with the exercise of any power belonging to the general government, and, if it is not, it is prohibited by no constitutional implication."

In Utah & Northern R. Co. v. Fisher, 116 U. S. 28, 6 Sup. Ct. 246, 29 L. Ed. 542, the right of the territory of Idaho to tax the railroad and property used in operating it, within the Ft. Hill Indian reservation, was sustained, and it was said that the authority of the territory rightfully extended to all matters not impairing the treaty rights of the Indians. In Central Pacific R. Co. v. California, 162 U. S. 91, 16 Sup. Ct. 766, 40 L. Ed. 903, the tax was levied upon the franchise of the railroad. In affirming the judgment of the state court (People v. Central Pac. R. Co., 105 Cal. 576, 38 Pac. 905), sustaining the state in its contention, it was said:

"So far as the ability of the company to discharge its duties and obligations to the general government is concerned, it is difficult to see that taxation of the state franchise would tend to impair that ability any more than taxation of the roadway, roadbed, rails, and rolling stock. If the necessary effect of a tax on such tangible property is not to unconstitutionally hinder the efficient exercise of the power to serve the government, neither can it be so in respect of the state franchise. Indeed, the taxation by the state of the franchise granted by it does not, and could not, prevent plaintiff in error from acting under its federal franchise."

In Thomas et al. v. Gay, 169 U. S. 264, 18 Sup. Ct. 340, 42 L. Ed. 740, an act of the Oklahoma Territorial Legislature, approved March 5, 1895, making cattle which were kept or grazed on the Indian reservations in said territories subject to taxation, was held not a violation of the rights of the Indians, as such taxation was not upon the land or privileges of the Indians. The contention was that, irrespective of the question whether said lands were by the treaties excluded from the limits and jurisdiction of the territory of Oklahoma, the taxation of cattle located for grazing purposes upon the reservations, under leases duly approved by acts of Congress, was a violation of the rights of the Indians and an invasion of the jurisdiction and control of the United States over them and their lands. It was further claimed that the Indians were directly and vitally interested in the property so to be taxed, and their rights and persons seriously affected by the legislation complained of; that the money contracted to be paid for the privilege of grazing was to be paid to the Indians as a tribe and was used and expended by them for their own purposes; and that if by reason of this taxation the conditions at the time the

leases were executed were changed, or could be changed by the Legislature at its pleasure, the value of the lands for such purposes would fluctuate or be destroyed altogether, according to such conditions. Answering the contention, it was said that the tax upon the cattle of the lessees was too remote and indirect to be deemed a tax upon the lands or privileges of the Indians. It was next contended that the tax law of the territory, in so far as it affected the Indian reservations, was in conflict with the constitutional power of Congress to regulate commerce with the Indian tribes; that it was an interference with, or an imposed servitude upon, a lawful commercial enterprise with the Indians, over which Congress had absolute control, and in the exercise of which control it had enacted the statute authorizing the leasing by Indians of their unoccupied lands for grazing purposes. Answering which, the court said:

"The unlimited power of Congress to deal with the Indians, their property and commercial transactions, so long as they keep up their tribal organizations, may be conceded; but it is not perceived that local taxation, by a state or territory, of property of others than Indians, would be an interference with congressional power. It was decided in Utah & Northern Ry. Co. v. Fisher, 116 U. S. 28 [6 Sup. Ct. 246] 29 L. Ed. 542, that the lands and railroad of a railway company within the limits of the Ft. Hall Indian reservation in the territory of Idaho was lawfully subject to territorial taxation, which might be enforced within the exterior boundaries of the reservation by proper process. The question was similarly decided in Maricopa & P. R. Co. v. Arizona Territory, 156 U. S. 347 [15 Sup. Ct. 391], 39 L. Ed. 447. The taxes in question here were not imposed on the business of grazing, or on the rents received by the Indians, but on the cattle as property of the lessees, and, as we have heretofore said that such a tax is too remote and indirect to be deemed a tax or burden on interstate commerce, so is it too remote and indirect to be regarded as an interference with the legislative power of Congress."

The Constitution of Montana, in compliance with the conditions of the Enabling Act (25 Stat. at L. 676), contained in section 4, subd. 2, a disclaimer of all right to any public lands owned or held by Indian treaties, and provided that until the Indian title was extinguished such lands should remain under the absolute jurisdiction and control of Congress. In Truscott v. Hurlbut Land & Cattle Co., 19 C. C. A. 374, 73 Fed. 60, it was held that this provision did not prevent the state or its counties from taxing cattle of a corporation grazing upon an Indian reservation, under a contract with the Indians, which was sanctioned by the United States. Other cases bearing more or less directly on the right of the state to tax property engaged

in interstate commerce, or of a federal agency, are: Lyng v. Michigan, 135 U. S. 161, 10 Sup. Ct. 725, 34 L. Ed. 150; Ficklen v. Taxing District of Shelby County, 145 U. S. 1, 12 Sup. Ct. 810, 36 L. Ed. 601; New York, L. E. & W. R. Co. v. Pennsylvania, 158 U. S. 431, 15 Sup. Ct. 896, 39 L. Ed. 1043; Henderson Bridge Co. v. Kentucky, 166 U. S. 150, 17 Sup. Ct. 532, 41 L. Ed. 953; Wagoner v. Evans, 170 U. S. 588, 18 Sup. Ct. 730, 42 L. Ed. 1154; Baltimore Ship Building & D. D. Co. v. Baltimore, 195 U. S. 375, 25 Sup. Ct. 50, 49 L. Ed. 242; Montana Catholic Mission v. Missoula County, 200 U. S. 118, 26 Sup. Ct. 197, 50 L. Ed. 398; Fidelity & Deposit Co. v. Pennsylvania, 240 U. S. 319, 36 Sup. Ct. 298, 60 L. Ed. 664; Moore v. Beason, 7 Wyo. 292, 51 Pac. 875; Noble v. Amoretti, 11 Wyo. 230, 71 Pac. 879; Cosier v. McMillan, 22 Mont. 484, 56 Pac. 965.

It cannot be urged, with an approach to plausibility, that the effect of the tax will deprive the oil company of its power to serve the Indians or the general government, acting in their behalf. On the contrary, it is without form of restraint or hindrance in the premises, in the discharge of its contractual obligations. By the act it is required to pay a tax upon the gross value of the oil and gas produced, and nothing more. This tax is imposed, not as a condition to the exercise of its authority to act and discharge the functions intended for its exercise, but as a tax upon the oil and gas when it becomes a marketable commodity, such as the coal at the pit's mouth, as was said to be permissible in Choctaw, O. & G. R. Co. v. Harrison, 235 U. S. 292, 35 Sup. Ct. 27, 59 L. Ed. 234. The tax is laid, not upon the operations of the company, or upon its right to carry on business, but upon that which by its enterprise it produces, and which by the terms of the statute is made in full and in lieu of certain of its other property connected with the business carried on, and as a substitute therefor. The fact that such a tax is imposed and required to be paid is too remote and indirect to be regarded as an interference with a federal agency, or a direct burden upon its free exercise. The purpose of the tax, and the only direct effect thereof, is to require that the company bear its proportion of the burdens of the state government under whose protection it conducts its operations, while the agency it serves is not subjected to restraint or impediment. The statute before us must not be confounded with the act of May 26, 1908 (Sess. Laws 1907-08, pp. 640-645), involved in Choctaw, O. & G. Co. v. Harrison, supra. There the statute provided:

" * * * A gross revenue tax * * * which shall be in addition to the taxes levied and collected upon an ad valorem basis upon the

property and assets of such corporation equal to the per centum of its gross receipts hereinafter provided."

And it was said that the court could not conclude that the gross receipts were intended merely to represent the measure of the value of the property liable under a general assessment. The material dissimilarity of the two statutes is so patent that it need only be said that the opinion does not furnish a rule of decision in construing the statute at hand. Where the present act provides that the tax is in full and in lieu of all taxes, the 1908 statute by express terms made the tax "in addition to the taxes levied and collected upon an ad valorem basis."

Nor is the case controlled by the decision of this court in Re Gross Production Tax of the Wolverine Oil Co., 53 Okla. 24, 154 Pac. 362, L. R. A. 1916F, 141, which involved the constitutionality of the act of March 11, 1915 (Sess. Laws 1915, c. 107, art 2, subd. "a," sec. 1). As the present act is amendatory of the 1915 statute, and was enacted in view of the decision in the Wolverine Case, and within 30 days after the petition for rehearing in that case was denied, and as it omits important provisions of the 1915 statute, and contains material provisions not in said statute, and which omitted and new provisions are important in determining the character of the tax, it would serve no useful purpose to consider the common provisions or the dissimilarities of the two statutes, in reaching a conclusion in the instant case. It is sufficient to say that, upon thorough consideration of the statute here involved, we are clearly of the opinion that it imposes neither an occupation nor license tax.

In Indian Territory Illuminating Oil Co. v. Oklahoma, 240 U. S. 522, 36 Sup. Ct. 453, 60 L. Ed. 779, the tax was levied under section 7338, Rev. Laws 1910, making the property of public service corporations, organized and doing business in this state, subject to taxation for state, county, municipal, public school, and other purposes, to the same extent as the real and personal property of private persons. The question was whether a certain assignment of a lease and rights thereunder, made by the Osage tribe of Indians, which lease conferred the privilege of prospecting, drilling wells, and mining and producing petroleum and natural gas upon the lands in Oklahoma Territory, was subject to a tax assessed under the laws of the state, as the property of the oil company in its capacity as a public service corporation. In the opinion it was said that both the State Board of Equalization and the referee, in sustaining the action, proceeded upon the consideration that the leases constituted taxable property, having no immunity under federal

law. The leases assessed formed, as we understand, an important part of the value fixed upon the company's property by the board of equalization. In denying the state's contention, the court held that the lease was not subject to taxation, whether as a separate object of taxation or as represented or valued by the stock of the company. The opinion therefore is not controlling, as the tax here is imposed, not upon the leases or the rights or privileges conferred thereby, but upon the production of oil and gas as property.

Having concluded that the tax is not objectionable by reason of the fact that the oil and gas upon which it is imposed were produced through the operations of a federal agency, it only remains to be seen whether said act is in conflict with the Constitution, because of the amount of the tax. Section 9, art. 10, of the Constitution, provides that, "except as herein otherwise provided," the total taxes on an ad valorem basis for all purposes, state, county, township, city or town, and school district, shall not exceed, in any one year, 31½ mills on the dollar. The maximum state levy is fixed at 3½ mills; county levy, 8 mills; township levy, 5 mills; city or town levy, 10 mills; and school district levy, 5 mills. Provision is made in said section for an additional county levy of not exceeding 2 mills for county high school and aid to the common schools of the county. The school district levy for school purposes may, by further provision, be increased in an amount not to exceed 10 mills on the dollar valuation. Section 10, art. 10, of the Constitution provides that for the purpose of erecting public school buildings in counties, cities, or school districts, an additional levy for that purpose, of not to exceed 5 mills on the dollar, may be made. Section 12 of article 10 confers upon the Legislature the power to provide for the levy and collection of numerous classes of special taxes, including gross revenue and production taxes. Section 13 of said article provides that the state may select its subjects of taxation and levy and collect its revenues independent of the counties, cities, or other municipal subdivisions, while by section 22 of said article it is provided that nothing in the Constitution shall be held or construed to prevent the classification of property for purposes of taxation, and the valuation of different classes by different means or methods.

It is a cardinal rule in the construction of a Constitution that it is to be so interpreted as to permit the objects for which it was framed and adopted, and to this end the whole instrument is to be examined, with a view to ascertaining the meaning of each and every part. Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; Prigg v. Pennsylvania, 16 Pet.

539, 10 L. Ed. 1060; Julliard v. Greenman, 110 U. S. 421, 4 Sup. Ct. 122, 28 L. Ed 204; Stanford v. Magill, 6 N. D. 536, 72 N. W. 938, 38 L. R. A. 773. The presumption and legal intendment is that each and every clause in a written Constitution has been inserted for some useful purpose, and therefore the instrument must be construed as a whole in order that its intent and general purpose may be ascertained. As a necessary result of this rule, it follows that, wherever it is possible to do so, each and every provision must be so construed that it shall harmonize with all others, without distorting the meaning of any of such provisions, to the end that the intent of the framers may be ascertained and carried out and effect given to the instrument as a whole. Wilcox v. People, 90 Ill. 186, 196; People ex rel. Jackson v. Potter, 47 N. Y. 375; Coffin v. Board of Election Com'rs, 97 Mich. 188, 56 N. W. 567, 21 L. R. A. 662; Hawkins v. Filkins, 24 Ark. 287; Marye v. Hart et al., 76 Cal. 291, 18 Pac. 325; Dyer v. Bayne, 54 Md. 87.

If the maximum levy for state purposes fixed by section 9, art. 10, extends to all taxes, whether assessed according to section 8, art. 10, or imposed by the Legislature, pursuant either to sections 12, 13, or 22 of art. 10, then the tax in question, being in excess of the maximum levy for state purposes, cannot be sustained. But the language of section 9 does not, necessarily, authorize this conclusion, for it is expressly provided that "except as herein otherwise provided," the maximum levy shall be that provided for in said section.

The office of an exception in a statute (alike applicable to a Constitution) is, generally speaking, to take or exclude from the operation of the statute certain things or subjects which would otherwise be included therein. Campbell v. Jackman, 140 Iowa, 475, 118 N. W. 755, 27 L. R. A. (N. S.) 288; Cassidy v. Royal Exchange Assur. of London, 99 Me. 399, 59 Atl. 549; State v. Barrett, 172 Ind. 169, 87 N. E. 7; Pabst Brewing Co. v. Milwaukee, 148 Wis. 582, 133 N. W. 1112; Rowell v. Janvrin, 151 N. Y. 60, 45 N. E. 308. There is nothing in the Constitution expressly giving to the counties and municipal subdivisions thereof the right to levy taxes on all property situated therein. We must assume that the framers of the Constitution, in conferring upon the state both the authority to provide for the levy and collection of the specific taxes named in section 12, art. 10, as well as the power of the state to select its subjects of taxation and levy and collect its revenues independent of the counties, cities, and other municipal subdivisions thereof, acted with deliberation, and had in view some definite purpose. All property upon

which the state may impose a tax is, of course, situated within one or more counties of the state, and hence the state must, in selecting its subjects of taxation, invade the territorial jurisdiction of the counties, and, it may be, that of the cities or other municipal subdivisions thereof. In order that the Legislature might not be constitutionally controlled in the amount of the special taxes which it was authorized to levy, the Constitution in fixing the maximum levy provided, in the introductory portion of section 9, art. 10, "except as herein otherwise provided." This limitation upon the amount of the levy imposed in said section has reference, we think, to property in general, assessed for taxation at its fair cash value, where it is subjected to an ad valorem tax for all purposes, state and municipal, as provided in section 9, art. 10; and does not constitute a restriction upon the power of the Legislature to enact the statute under review, imposing a tax "for current expenses of state government," in excess of 3½ mills on the dollar.

While the tax here involved is imposed according to value, it is without assessment as required by section 8, art. 10. To hold that the limitation of 3½ mills applies to classes of property selected by the Legislature under authority of section 13, art. 10, would, in the exercise of the authority, result in an unjust discrimination and gross inequality of taxes between subjects so selected and those selected for local ad valorem taxation, because classes of property selected for taxation by the state, if section 9 furnishes the limit of the amount of the levy, could only be taxed 3½ mills, while property not so selected, but taxed in the ordinary manner, could be taxed 31½ mills, exclusive of the further provisions by which county and school district taxes may be increased. The tax imposed is, we think, authorized by sections 13 and 22, art. 10, and the statute was enacted under authority of the express grants of power contained therein. The purpose of the Legislature undoubtedly was to enact a statute that would bring about uniformity in the taxation of oil and gas within the state. To tax the oil on hand at any given annual date furnished a manifestly inadequate means of reaching one of the principal, and we may add richest, industries of the state, because such annually recurring tax would reach only a negligible quantity of the annual production. The act treats all producers alike, whether the production is carried on through the instrumentality of a federal agency, or otherwise. It is fair alike to the producer, and to every other taxpayer of the state, unless it be in the matter of the equality of the rate—a question not here involved. By it there are no fluctuating esti-

mates of values by the various county assessors, but instead a fixed and common uniformity not ordinarily obtainable, though greatly to be desired, in the complex and difficult subject of taxation. There is a market known to the taxing authorities, and the records of production are easily verified. In short, a tax based on the gross value of the production (less royalty of the owner) seemed to be the best adapted and most scientific plan known for taxing oil and gas. This results from a variety of reasons, but one of which need be referred to. Mining property, and particularly oil and gas in nature's storehouse, constitutes a class of property of such character that its real value is hard to estimate and impossible to ascertain with any degree of certainty. The assessment of such property furnishes such an intricate, perplexing, and difficult problem, of many unusual complications, that it is practically impossible to tax the same directly by the ordinary means of ad valorem taxation. The value of an oil and gas well, after completion, depends upon the product thereof, its quality and quantity, and cost of production. This cannot, at least as to the quantity, be known until the oil and gas has been taken from the well; after which such well has no value. That the state was rich in mineral resources, particularly in its vast oil and gas deposits, was known to the framers of the Constitution, and it is not improper to assume that with the facts in mind, and to meet a situation certain to arise, if indeed not then existing, the members of the Convention provided that the Legislature should have the power to value different classes of property by different means or methods, and to authorize the state to select its subjects of taxation and collect its revenues independent of the counties, cities, or other municipalities. The act does not invade the general field of taxation, such as affects property generally throughout the state, but instead is confined to a tax levied on oil, gas, and certain mineral ores named therein.

While the tax is based on the gross value of the production, and is therefore, in a sense, an ad valorem tax, as distinguished from a specific tax, it is not, however, a tax levied on an ad valorem basis within the meaning, and subject to the limitations of, section 9, art. 10, of the Constitution. The act imposes a special tax in lieu of and as a substitute for the general ad valorem tax on the oil and gas and the property of the producer used in the production thereof, and is levied by the Legislature in the exercise of its constitutional power to select property for the purposes of taxation, and to value and classify such property by means and methods differing from that commonly employed in the assessment, levy, and collection of taxes by counties and other municipal authorities.

The judgment of the trial court is affirmed.

All the Justices concur.