# OKLAHOMA TAX COMMISSION *v.* TEXAS COMPANY.

NO. 40.

Argued November 19, 1948.—Decided March 7, 1949.

*R. F. Barry* argued the cause for petitioner. With him on the brief was *Joe M. Whitaker. Mac Q. Williamson,* Attorney General of Oklahoma, and *Fred Hansen,* Assistant Attorney General, were also of counsel.

*B. W. Griffith* argued the cause and filed a brief for respondent in No. 40.

*Robert W. Richards* argued the cause for respondent in No. 41. With him on the brief was *Walace Hawkins.*

*Hayes McCoy* and *R. O. Mason* filed a brief in No. 40, as *amici curiae,* urging affirmance.

*Solicitor General Perlman, Assistant Attorney General Caudle, Arnold Raum* and *Hilbert P. Zarky* filed a brief in Nos. 40 and 41 on behalf of the United States, as *amicus curiae,* urging reversal.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

The principal question is whether a lessee of mineral rights in allotted and restricted Indian lands is immunized by the Constitution against payment of nondiscriminatory state gross production taxes and state excise taxes on petroleum produced from such lands. In effect the issue is whether this Court's previous decisions in *Howard* v. *Gipsy Oil Co.,* 247 U. S. 503; *Large Oil Co.* v. *Howard,* 248 U. S. 549; and *Oklahoma* v. *Barnsdall Refineries,* 296 U. S. 521, invalidating such taxes as applied to like lessees, have been so undermined by later decisions, in particular *Helvering* v. *Mountain Producers Corp.,* 303 U. S. 376, that they should now be overruled.

With certain exceptions,[1] the lands from which was extracted the petroleum sought to be taxed are held in

_____

[1] Interests in the lands to which the United States does not hold title are of two kinds: (1) undivided interests acquired by non-Indians; (2) an interest (which is still restricted) conveyed to the son of an allottee by approved noncompetent Indian deeds, pursuant to the Act of March 1, 1907, 34 Stat. 1018, 25 U. S. C. § 405.

trust by the United States, pursuant to allotments made under the General Allotment Act,[2] for various members of the Pottawatomie, Apache, Comanche, and Otoe and Missouria Tribes.[3] All the lands are located within the State of Oklahoma and at all material times they were restricted[4] against alienation by the Indian *cestui* owners without the consent of the Secretary of the Interior.[5] He

---

[2] February 8, 1887, 24 Stat. 388, as amended, 25 U. S. C. § 331 *et seq.*

[3] The allotments were made to members of the Apache and Comanche tribes pursuant to the agreement approved by Congress on June 6, 1900, 31 Stat. 676. Members of the Citizen Band of the Pottawatomie Tribe were allotted land pursuant to the agreement of March 3, 1891, 26 Stat. 1016. Allotments were made to the Otoe and Missouria Indians under the General Allotment Act without special agreement. Mills, Oklahoma Indian Land Laws § 438 (1924).

The nature of the Indians' interest has been described as follows: ". . . the United States retained the legal title, giving the Indian allottee a paper or writing, improperly called a patent, showing that at a particular time in the future, unless it was extended by the President, he would be entitled to a regular patent conveying the fee." *United States* v. *Rickert,* 188 U. S. 432, 436.

[4] With these exceptions: (1) In a single immaterial instance in No. 40, an undivided 7/16th interest in one of the leases was alienable and was owned by non-Indians. The Texas Company paid without protest the taxes levied against it which were attributable to this 7/16th interest. (2) In No. 41, an undivided 1/4th interest in the lands subject to one of the leases and an undivided 1/3d interest in the land subject to another lease were owned by non-Indians. The effect of the decision of the Oklahoma Supreme Court was to deny the portion of the assessments applicable to these interests. However, it was conceded at the argument here that the assessments were valid insofar as they applied to interests in lands owned, when the assessments were made, by non-Indian owners or by Indian owners not under restriction.

[5] 24 Stat. 389, 390, as amended, 25 U. S. C. §§ 348, 349. See Cohen, Handbook of Federal Indian Law 108–109 (1942). Leases of allotted land for mining purposes may be made with the approval of the Secretary of the Interior under 35 Stat. 783, 25 U. S. C. § 396.

approved each of the leases now in question. The respondents Texas Company (No. 40) and Magnolia Petroleum Company (No. 41) acquired their leases before Oklahoma levied the assessments now in issue, either as original lessees or by assignment from non-Indians who were such lessees. The companies thus became owners of all right, title and interest in their respective leases, subject only to the one-eighth royalty interest reserved to the Indian lessors, and were such owners at the times of the respective assessments. It may be taken that they have operated the leases in conformity with the applicable regulations of the Department of the Interior [6] and of the State of Oklahoma,[7] except for the payment of the state taxes in question.[8]

The Oklahoma gross production tax requires payment of five per cent of the gross value of production, including royalty interests. It is imposed on every person engaged in the production in Oklahoma of petroleum, crude oil or other mineral oil, and natural gas and casinghead gas. The tax is exacted in lieu of all taxes by the state

---

[6] 52 Stat. 348, 25 U. S. C. § 396d; 30 C. F. R. Cum. Supp. §§ 221.1–221.67.

[7] 52 Okla. Stat. §§ 81–286.17 (Conservation of Oil and Gas), §§ 291–303 (Regulation and Inspection of Wells) (Cum. Supp. 1947); Order No. 1299—Cause No. 2935, Thirty-seventh Annual Report of Corporation Comm'n of Okla., 1944, p. 84.

The assumption stated in the text is made, although in No. 41 the commission excluded, as irrelevant, evidence tendered to show compliance with the federal and state regulations, and in No. 40 no evidence of compliance was introduced.

[8] The three oil and gas leases involved in No. 40 were made by members of the Apache Tribe to non-Indian lessees who assigned their interests to the Texas Company. In No. 41, in which eight leases are involved, the Indian lessors are members of the Apache, Comanche, Citizen Pottawatomie, and Otoe and Missouria Tribes.

Undivided interests in the lands subject to certain leases were held by non-Indians at the time of assessment. See notes 1 and 4.

346

and its political subdivisions on property rights in minerals and mineral rights, producing leases, machinery used in connection with any oil or gas well, the oil and gas during the tax year in which it is produced, and any investment in any leases, minerals, or other property. The statute authorizes the state board of equalization to raise or lower the rate of tax to equate the amount payable with the amount which would be payable if the general *ad valorem* property tax were assessed against the property of the producers subject to taxation. The board's rate changes are subject to review by the state supreme court.[9] In consequence of these provisions, the tax has been construed consistently by the state courts to be a tax on the lessee's property, not an occupation or excise tax.[10]

[9] 68 Okla. Stat. § 821 (1941). The (general) scheme of the tax is as follows: The tax falls due on the first day of each calendar month as to production during the preceding month. The purchaser pays the tax on oil or gas sold at the time of production and is authorized to deduct the amount of tax paid when settling with the producer (and with the royalty owner in cases in which the tax applies to him, see note 14). If the tax becomes due before the oil is sold, the producer is required to pay the tax for himself (and, in cases where the tax applies to royalties, see note 14, for the royalty owner, and is permitted to deduct the amount of tax paid on royalty oil when settling with the royalty owner). 68 *id.* § 833. The tax is a first and paramount lien against the property of the person liable for the tax. 68 *id.* § 836.

Of the proceeds received from the tax, 78 per cent is paid into the state treasury to be used for the general expenses of state government. Ten per cent is paid to the county treasurer of the county in which the oil or gas was produced, and is used for the construction and maintenance of county highways. Ten per cent is paid to the county treasurer for distribution among the county's school districts. The remaining two per cent is placed to the credit of the Oklahoma Tax Commission and is used for collection and enforcement activities. 68 *id.* § 827 (Cum. Supp. 1947).

[10] But see note 27 and text *infra.*

The petroleum excise tax requires payment of one mill, formerly one-eighth of one cent,[11] per barrel on every barrel of petroleum produced in Oklahoma. The statute was enacted first in 1933 to defray the expenses of administering the state's newly adopted proration law [12] and has been reenacted at each subsequent session of the legislature.[13] The tax, unlike the gross production tax, is construed by the Oklahoma Supreme Court as an excise tax on the production of oil. *Barnsdall Refineries* v. *Oklahoma Tax Commission,* 171 Okla. 145, affirmed, 296 U. S. 521.

In No. 40 the Oklahoma Tax Commission, petitioner here, assessed both gross production and petroleum excise taxes against the Texas Company for production, less royalties to the Indian lessors,[14] during September, Oc-

---

[11] The amount of the tax was one-eighth of one cent per barrel for the period prior to July 1, 1943, Okla. Laws, 1941, tit. 68, c. 26, and one mill per barrel after that date, Okla. Laws, 1943, tit. 68, c. 26. The Texas Company was assessed under the former act. Magnolia was assessed under both acts.

[12] Okla. Laws, 1933, c. 131, as amended, 52 Okla. Stat. 81 *et seq.* (Cum. Supp. 1947).

[13] Okla. Laws, 1933, c. 132; Okla. Laws, 1935, c. 59, Art. 2; Okla. Laws, 1937, c. 59, Art. 2; Okla. Laws, 1939, c. 66, Art. 7; Okla. Laws, 1941, tit. 68, c. 26; Okla. Laws, 1943, tit. 68, c. 26; Okla. Laws, 1945, tit. 68, c. 26; Okla. Laws, 1947, tit. 68, c. 26. The present statute appears at 68 Okla. Stat. § 1220.1 *et seq.* (Cum. Supp. 1947).

The tax receipts, collected in the same manner as in the case of the gross production tax, present 68 Okla. Stat. § 1220.1 (Cum. Supp. 1947), are deposited to the credit of the "Conservation Fund" and the "Interstate Oil Compact Fund of Oklahoma." 68 *id.* 1220.3.

[14] Although the Oklahoma statutes in their general application lay the taxes on gross production, including royalties, cf. notes 9 and 13, they provide, with respect to the gross production tax, that the producer, in his required monthly statement to the Oklahoma Tax Commission, state "where such royalty is claimed to be exempt from taxation by law, the facts on which such claim of

tober and November, 1942. In No. 41 the commission likewise assessed both taxes, less royalties, on the Magnolia Company's production for various periods between June 1, 1942, and March 1, 1946. The orders were entered after the cases were consolidated for hearing before the commission and were thus heard by it.

In No. 40 the Texas Company paid the taxes under protest and brought suit to recover them in an Oklahoma trial court. After hearing, that court sustained the commission's demurrer to the company's amended petition and ordered it dismissed. Appeal was duly taken to the state supreme court. In No. 41, following a different statutory procedure, the Magnolia Company appealed from the assessments against it directly to that court.

In both cases the Supreme Court of Oklahoma, with one judge dissenting, held the assessments invalid. The decisions rested flatly on the ground that the lessee was an instrumentality of the Federal Government and as such, under prior and controlling decisions of this Court, particularly in the *Large Oil, Gipsy Oil,* and *Barnsdall Refineries* cases, *supra,* not subject to the taxes in question.[15] In the Texas Company case the court expressly distinguished *Helvering* v. *Mountain Producers Corp., supra,* on the ground that the decision in that case related

---

exemption is based." 68 Okla. Stat. § 821 (1941). This provision is made applicable to the petroleum excise tax by the first section of each of the several enactments establishing and continuing that exaction. See note 13 *supra.* Only the interests of the lessees were assessed in these cases.

[15] The Oklahoma Supreme Court rendered separate, unreported opinions. The principal opinion, filed in the Texas Company case, was followed in the later one filed in the Magnolia Petroleum case. Rehearing was denied in both cases.

The original judgment in the Texas Company case provided for reversal of the trial court's judgment, with directions to overrule the commission's demurrer "and proceed consistent with the views

to income taxes assessed against the lessee there situated as were the lessees here. The opinion, indicating the writer's personal view that reconsideration of the earlier decisions well might be sought, nevertheless stated:

> "But it is thought beyond the power of this court to now engage in such reconsideration, in view of the cited decisions of the higher authority which thus far wholly sustain the claim of [the Texas Company] to immunity from the tax here involved.
>
> "Upon questions of federal law, citizens and their attorneys have the right to rely upon decisions of the Supreme Court of the United States, and upon such questions it is our fixed duty to follow such decisions, leaving to the United States Congress or Supreme Court the making of the necessary changes in such legal rules."

From the state supreme court's decisions [16] the Oklahoma Tax Commission filed appeals in this Court. We dismissed the appeals for want of jurisdiction. But treating them as applications for certiorari,[17] we granted the writs and consolidated the cases for argument. 333 U. S. 870. The Solicitor General was requested to file a brief as *amicus curiae*.

### I.

But for the course of decision here from *Choctaw, O. & G. R. Co.* v. *Harrison*, 235 U. S. 292, decided in 1914, to

---

here expressed." On motion of counsel for the commission this was modified to provide that "The trial court judgment . . . is reversed" and that "final judgment is hereby rendered for plaintiff and against the defendant for the sum sued for," thus eliminating all question concerning the finality of the judgment.

[16] See note 15 *supra*.

[17] Pursuant to former § 237 (c) of the Judicial Code, as amended, 28 U. S. C. § 344 (c), present 28 U. S. C. § 2103.

*Oklahoma* v. *Barnsdall Refineries,* 296 U. S. 521, decided
in 1936, the problems of taxation and intergovernmental
immunity these cases present would seem subject to solu-
tion on well-settled or fairly obvious legal principles.

It has long been established that property owned by
a private person and used by him in performing services
for the Federal Government is subject to state and local
*ad valorem* taxes.[18] And the oil and gas produced is, of
course, subject to such taxation. *Indian Territory Illu-
minating Oil Co.* v. *Board of Equalization,* 288 U. S. 325.
Both by the substance of the statute's explicit provisions
and by the consistent construction of the Oklahoma
Supreme Court,[19] that state's so-called gross production
tax in its presently applicable form is a tax on the lessee's
property used in carrying out its contractual obligations
with the Federal Government and on the oil and gas
during the tax year in which it was produced. The tax
is levied expressly in lieu of all property taxes which
the state might constitutionally impose in *ad valorem*
form, the gross production levy being a tentative measure
for the value of that property. To guard against that
measure's being utilized to lay in effect a tax not actually
of that character, the state board of equalization is au-
thorized, indeed is required upon complaint, to equate
the amount payable with what would be payable if the
general *ad valorem* tax were assessed against the property
of the producing lessees subject to taxation, with pro-
vision for judicial review of the board's action.

Unembarrassed by some of this Court's prior decisions,
therefore, Oklahoma's so-called gross production tax

---

[18] *Thomson* v. *Pacific R. Co.,* 9 Wall. 579; *Railroad Co.* v. *Peniston,*
18 Wall. 5; *Central Pacific R. Co.* v. *California,* 162 U. S. 91; *Gromer*
v. *Standard Dredging Co.,* 224 U. S. 362, 371; *Choctaw, O. & G.
R. Co.* v. *Mackey,* 256 U. S. 531, 535–537.

[19] See note 27 and text.

would seem to be sustained by the well-established line of decisions cited above.[20]

Moreover, even if the status of respondents as federal instrumentalities, in the sense in which they use the term, were fully conceded, it seems difficult to imagine how any substantial interference with performing their functions as such in developing the leaseholds could be thought to flow from requiring them to pay the small tax Oklahoma exacts to satisfy their shares of the state's expense in maintaining and administering its proration program. That system works for respondents' benefit in performing their producing function, as it does for the benefit of all other producers, by stabilizing production, eliminating waste, and preventing runaway competition in an industry notorious for those evils in the absence of some such control. Cf. *Railroad Commission* v. *Rowan & Nichols Oil Co.*, 310 U. S. 573; *Republic Gas Co.* v. *Oklahoma*, 334 U. S. 62, dissenting opinion Part III, 89. Indeed respondents do not claim they are exempt from the plan's regulatory features. They claim only that they are constitutionally immune from con-

---

[20] But see text *infra*, Part III. Unless the measure of a tax is fairly to be considered as designed to conceal or distort unduly its true nature, the tax is not to be invalidated because the measure is not one customarily employed if as applied it achieves fairly the purpose for which it is avowedly laid, that purpose of course being one within the legislative power to accomplish. *American Mfg. Co.* v. *St. Louis,* 250 U. S. 459; *Hope Gas Co.* v. *Hall,* 274 U. S. 284; *Utah Power & Light Co.* v. *Pfost,* 286 U. S. 165. Moreover, ordinarily the construction given to a state statute by the state's highest court capable of deciding the question is taken as binding on this Court. See *e. g., Knights of Pythias* v. *Meyer,* 265 U. S. 30, 32–33; *Guaranty Trust Co.* v. *Blodgett,* 287 U. S. 509, 513; *Hartford Accident Co.* v. *Nelson Co.,* 291 U. S. 352, 358. Cf. *Galveston, H. & S. A. R. Co.* v. *Texas,* 210 U. S. 217, 227; *Hanover Insurance Co.* v. *Harding,* 272 U. S. 494, 509–510; *Carpenter* v. *Shaw,* 280 U. S. 363, 367–368.

tributing to the plan's support. As a matter entirely fresh, the contention would not seem weighty.

## II.

But neither issue is fresh. Each is complicated by this Court's prior decisions squarely ruling that the taxes are invalid as unconstitutional intrusions by the state upon the performance of federal functions. Those decisions have not been explicitly overruled. But it is strongly urged that our later decisions, especially in *Helvering* v. *Mountain Producers Corp., supra,* have stricken the foundation from beneath the *Gipsy Oil, Large Oil* and *Barnsdall Refineries* decisions, *supra,* so that the latter no longer can stand in reason and consistency with the former.

It is true that this Court's more recent pronouncements have beaten a fairly large retreat from its formerly prevailing ideas concerning the breadth of so-called intergovernmental immunities from taxation, a retreat which has run in both directions—to restrict the scope of immunity of private persons seeking to clothe themselves with governmental character from both federal and state taxation. The history of the immunity, by and large in both aspects, represents a rising or expanding curve, tapering off into a falling or contracting one.

Our present problem lies on the constitutional level. It requires reconsideration of former decisions specifically in point, together with later ones deviating in rationale. It is of substantial importance both for the states' powers of taxation and for the subjects on which they may impinge. Moreover, even though the immediate questions are closely related to federal policies concerning Indian lands, they are equally tangent to considerations affecting other types of situation raising questions of immunity. For these reasons it will not

be amiss to consider the questions in the context of two conflicting courses of decision.

Before we turn to the survey, however, two delimitations of the specific issues should be made.

These cases present no question concerning the immunity of the Indian lands themselves from state taxation. There is no possibility that ultimate liability for the taxes may fall upon the owner of the land. Cf. *Wilson* v. *Cook,* 327 U. S. 474, dissenting opinion, 489. Nor, as has been noted, do the cases involve challenges to the immunity from state taxation of royalty oil, the Indian's share of production.[21]

## III.

Despite the possibility that the prospect of taxation by the state may reduce the amount the United States might receive from the sale of its property, it is well established that property purchased by a private person from the Federal Government becomes a part of the general mass of property in the state and must bear its fair share of the expenses of local government. The theoretical burden which state *ad valorem* property taxation thus imposes upon the Federal Government is regarded as too remote and indirect to justify tax immunity for property purchased from that Government. *New Brunswick* v. *United States,* 276 U. S. 547; *Forbes* v. *Gracey,* 94 U. S. 762; *Tucker* v. *Ferguson,* 22 Wall.

---

[21] See note 14 *supra.* Cf. *Carpenter* v. *Shaw,* 280 U. S. 363, holding that oil royalties received by Indian lessors from nontaxable allotted lands were not subject to a state gross production tax, the tax being regarded as on the lessor's interest rather than on the severed oil. But royalty income is subject to state and federal net income taxes. *Choteau* v. *Burnet,* 283 U. S. 691; *Superintendent of Five Civilized Tribes* v. *Commissioner,* 295 U. S. 418; *Leahy* v. *State Treasurer,* 297 U. S. 420.

527; see *Weston* v. *Charleston,* 2 Pet. 449, 468. Also subject to local *ad valorem* taxation, as has been noted above,[22] is property owned by a private party and used by him in performing services for the Federal Government. Where oil produced by a private lessee from restricted Indian lands was owned solely by the lessee and had been removed from the leased lands and stored in the lessee's tanks, it was held subject to state *ad valorem* taxation. *Indian Territory Illuminating Oil Co.* v. *Board of Equalization,* 288 U. S. 325.[23] And equipment used by a lessee of restricted Indian lands has been held subject to the same sort of exaction. *Taber* v. *Indian Territory Illuminating Oil Co.,* 300 U. S. 1. Cf. *Thomas* v. *Gay,* 169 U. S. 264, sustaining a state tax on cattle grazing on tribal lands leased from Indians by the non-Indian owner of the cattle.

Anomalous in the light of these rulings was the evolution of a line of decisions of this Court condemning forms of taxation which would have imposed no more direct or substantial burden upon the United States than would an *ad valorem* property tax applied to property purchased from the United States. Private lessees of restricted or tribal Indian lands came to be held "federal instrumentalities" like the lands themselves, and so immune from various forms of state taxation ranging from a gross production tax on production from the leased lands to a tax upon the lessee's net income. The theory of the Court was the one which was rejected in directly analogous cases: A state tax on the lessee, the lease, or the profits from the lease would be "a direct hamper upon the effort of the United States to make the best terms that it can

---

[22] At note 18.

[23] Distinguishing *Jaybird Mining Co.* v. *Weir,* 271 U. S. 609, on the ground that there the interest of the Indian lessor had not been prepaid or segregated.

for its wards." *Gillespie* v. *Oklahoma,* 257 U. S. 501, 506. Alternatively, "A tax upon the leases is a tax upon the power to make them, and could be used to destroy the power to make them." *Indian Territory Illuminating Oil Co.* v. *Oklahoma,* 240 U. S. 522, 530.

The history of this development is a progression "from exemption of the gross income of the lessee of Indian lands . . . through exemption of net receipts to serious impairment of the taxing powers of Oklahoma." Cohen, Handbook of Federal Indian Law 257, n. 29 (1942). The development is an outgrowth and a progressive extension of early rulings that tribal lands themselves are immune from state taxation.[24] More immediately it stems from the later ruling that allotted Indian lands held in trust by the United States were "an instrumentality employed by the United States for the benefit and control of this dependent race," and so were immune from state taxation. *United States* v. *Rickert,* 188 U. S. 432, 437–439.

In 1908 Oklahoma imposed, in addition to *ad valorem* property taxes, a gross production tax, the progenitor of the present tax bearing that label, on oil, gas and other minerals produced within the state. Okla. Laws, 1908,

---

[24] See *The Kansas Indians,* 5 Wall. 737; *The New York Indians,* 5 Wall. 761. Those early decisions seem to rest on the basis that the Indian tribes possessed many attributes of sovereignty.

As to the immunity from state taxation of lands acquired by individual Indians by treaty or under the general homestead laws rather than under the General Allotment Act, see Cohen, *op. cit. supra* note 5, at 257–258, 259–260.

Lands outside a reservation purchased with restricted Indian funds from a person who did not hold the land tax exempt were held subject to state taxes in *Shaw* v. *Gibson-Zahniser Oil Corp.,* 276 U. S. 575. But Congress specifically exempted such lands from taxation. Act of June 20, 1936, 49 Stat. 1542, as amended, 50 Stat. 188 (to limit the exemption to homesteads), 25 U. S. C. § 412a. See Cohen, *op. cit. supra,* at 260–261. This legislation was sustained and applied in *Board of Commissioners* v. *Seber,* 318 U. S. 705.

c. 71, Art. II, § 6. The Oklahoma court held that the 1910 reenactment of the statute [25] imposed a property tax. *McAlester-Edwards Coal Co.* v. *Trapp,* 43 Okla. 510. But the statute, as applied to a lessee of restricted Indian coal lands, was held by this Court to be an occupational tax and so an unconstitutional burden on the lessee, who was held to be an instrumentality of the Federal Government. *Choctaw, O. & G. R. Co.* v. *Harrison, supra.* Next the Court held the lease itself a federal instrumentality immune from state taxation. *Indian Territory Illuminating Oil Co.* v. *Oklahoma, supra.*

The Oklahoma legislature revised the gross production tax statute in 1915 and again in 1916, a principal change being the provision that the tax was in lieu of all other *ad valorem* taxes.[26] The revised tax was held by the Oklahoma Supreme Court to be a property tax.[27] But this Court rejected that construction *sub silentio* and invalidated the tax in memorandum opinions citing only the *Choctaw, O. & G. R. Co.* case (235 U. S. 292) and

---

[25] Okla. Laws, 1910, c. 44, § 6, adding a provision permitting the producer to deduct the amount of royalties paid for the benefit of an Indian tribe.

[26] Okla. Laws, 1915, c. 107, Art. 2, subd. A; Okla. Laws, 1916, c. 39. Further amendments were made by Okla. Laws, 1933, c. 103, and by Okla. Laws, 1935, c. 66, Art. 4. See note 9 and text *supra.*

[27] *Large Oil Co.* v. *Howard,* 63 Okla. 143, reversed *per curiam,* 248 U. S. 549. *In re Gross Production Tax of Wolverine Oil Co.,* 53 Okla. 24, which had held that the 1915 Act was an occupational rather than a property tax, was distinguished because of changes made by the 1916 Act. The *Wolverine* case was specifically overruled in *In re Skelton Lead & Zinc Co.'s Gross Production Tax, 1919,* 81 Okla. 134; accord, *Bergin Oil & Gas Co.* v. *Howard,* 82 Okla. 176. The Oklahoma Supreme Court has since consistently held that the tax is a property tax in lieu of all other *ad valorem* taxes. *E. g., In re Protest of Bendelari, Agent,* 82 Okla. 97. And see *Meriwether* v. *Lovett,* 166 Okla. 73; *State* v. *Indian Royalty Co.,* 177 Okla. 238; *Peteet* v. *Carmichael,* 191 Okla. 593.

the *Indian Territory Illuminating Oil Co.* case (240 U. S. 522). *Howard* v. *Gipsy Oil Co.*, 247 U. S. 503; *Large Oil Co.* v. *Howard*, 248 U. S. 549.

Suspicions that this Court had overlooked the fact that under the revised statute the gross production tax was in lieu of rather than in addition to all other *ad valorem* property taxes,[28] were dispelled by Mr. Justice Holmes' remark in *Gillespie* v. *Oklahoma, supra* at 504–505, that the statutory change had been noticed and regarded as immaterial.[29] If a gross receipts tax was a burden on the Federal Government "so as to interfere with the performance of its functions, it could not be saved because it was in lieu of a tax upon property or was so characterized." See *James* v. *Dravo Contracting Co.*, 302 U. S. 134, 158.

The high-water mark of immunity for non-Indian lessees of restricted and allotted Indian lands came in 1922 when the *Gillespie* decision, *supra,* invalidated an Oklahoma net income tax upon income derived by a lessee from sales of his share of oil produced from restricted lands.

The non-Indian lessee's immunity was last sustained here by *Oklahoma* v. *Barnsdall Refineries, supra.* That decision held, on application of a rule of strict construction of congressional waivers, that Congress' express waiver of immunity from gross production taxes on oil produced from the specified Indian lands did not extend to petroleum excise taxes. The state did not challenge

---

[28] The Oklahoma Supreme Court assumed for a time that the statutory difference was overlooked by this Court and that an opposite result would have been reached had the difference been noticed. *In re Skelton Lead & Zinc Co.'s Gross Production Tax, 1919,* 81 Okla. 134; *In re Protest of Bendelari, Agent,* 82 Okla. 97.

[29] The Oklahoma Supreme Court capitulated in *Atchison, T. & S. F. R. Co.* v. *McCurdy,* 86 Okla. 148.

the implied constitutional immunity but pitched its argument on the ground of statutory exemption.[30]

The instrumentality doctrine has been applied to confer a correlative immunity upon private lessees of state-owned lands. The Texas rule that oil and gas leases are present sales to the lessees of the oil and gas in place caused this Court to sustain the imposition of the federal income tax upon income of the lessee derived from the sale of oil and gas produced from lands leased from that state. It was observed that ". . . the remote and indirect effects upon the one government of such a non-discriminatory tax by the other have never been considered adequate grounds for thus aiding the one at the expense of the taxing power of the other." *Group No. 1 Oil Corp.* v. *Bass,* 283 U. S. 279, 282.

Although this decision may be taken to mark a turning point in expansion of the lessee's immunity, it was not immediately permitted to impair the *Gillespie* rationale. A tax on income would be no greater burden where, under applicable state law, "title" to the oil did not "pass" until the oil was removed from the ground. And although Justices Brandeis, Stone, Roberts and Cardozo contended that the *Gillespie* decision could not stand consistently with the principles which had been reaffirmed in the *Group No. 1 Oil* case, a majority of one in *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, provided a corollary to the rule of the *Gillespie* case. This was done by holding that the Federal Government was barred from taxing the income of a lessee of state lands as the state was barred from taxing the income of the lessee of federal lands.

A parallel immunity from state occupational or privilege taxes was once accorded private contractors with, or agencies of, the Government, *Williams* v. *Talladega,*

---

[30] See note 39 *infra.*

226 U. S. 404, notwithstanding the venerable rule that the property of such a contractor or agency is liable to state property taxation. See the cases cited *supra* in note 18. Decisions curtailing this immunity were presaged by *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514. It held subject to federal income taxation income received by a consulting engineer from a state for services in connection with temporary work. Equally significant was *Alward* v. *Johnson*, 282 U. S. 509, 514, which sustained a state tax measured by gross receipts on the property of a stage line engaged in carrying the mails.[31]

Later this Court sustained a state tax on the gross receipts of a contractor with the Federal Government, *James* v. *Dravo Contracting Co.,* 302 U. S. 134; *Silas Mason Co.* v. *Tax Commission,* 302 U. S. 186; a state tax on the net income of such a contractor, *Atkinson* v. *Tax Commission,* 303 U. S. 20; state sales and use taxes on purchases of materials used by a contractor in performing a cost-plus contract with the United States, *Alabama* v. *King & Boozer,* 314 U. S. 1; *Curry* v. *United States,* 314 U. S. 14; and a state severance tax imposed on a contractor who severed and purchased timber from lands owned by the United States, *Wilson* v. *Cook,* 327 U. S. 474. It was pointed out that

". . . the Constitution, unaided by Congressional legislation, . . . [does not prohibit] a tax exacted from the contractors merely because it is passed on economically, by the terms of the contract or otherwise, as a part of the construction cost to the Government. So far as such a non-discriminatory state tax upon the contractor enters into the cost of the materials to the Government, that is but a normal

[31] Cf. the contemporary case of *Willcuts* v. *Bunn,* 282 U. S. 216, holding capital gain resulting from resale of municipal bonds taxable under the federal income tax law.

incident of the organization within the same territory of two independent taxing sovereignties. The asserted right of the one to be free of taxation by the other does not spell immunity from paying the added costs, attributable to the taxation of those who furnish supplies to the Government and who have been granted no tax immunity." *Alabama* v. *King & Boozer*, 314 U. S. 1, 8–9.

The opportunity to reexamine the *Gillespie* and *Coronado* cases arose in 1938 in *Helvering* v. *Mountain Producers Corp.*, 303 U. S. 376, the decision upon which the Oklahoma commission relies most strongly to secure reversal of the judgments in the present cases. The *Mountain Producers* case involved the application of the federal income tax law to a *cestui* of an express trust which received the proceeds of the sale of oil taken from school lands owned by the State of Wyoming. The Court declined to distinguish the *Gillespie* and *Coronado* decisions on the narrow ground available, the fact that the taxpayer was a *cestui* of a trust which received the proceeds of the sale of the oil rather than the lessee itself. 303 U. S. at 383.[32]

Rather the Court sought broader grounding, which lay in reconsideration of the foundations of the *Gillespie* and *Coronado* decisions. The opinion stated:

"The ground of the decision in the *Gillespie* case, as stated by Mr. Justice Holmes in speaking for the Court, was that 'a tax upon the leases' was 'a tax upon the power to make them, and could be

---

[32] Cf. *Burnet* v. *A. T. Jergins Trust*, 288 U. S. 508, 516, in which a city leased oil and gas land to a private trust, which was held liable for a federal income tax on its share of the receipts, the Court stating that "the doctrine of *Gillespie* v. *Oklahoma* is to be applied strictly and only in circumstances closely analogous to those which it disclosed."

used to destroy the power to make them' (240 U. S. p. 530) and that a tax 'upon the profits of the leases' was 'a direct hamper upon the effort of the United States to make the best terms that it can for its wards.' [257 U. S. at 506.] In the light of the expanding needs of State and Nation, the inquiry has been pressed whether this conclusion has adequate basis . . . ." 303 U. S. at 384.

Noting that it had held that the *Gillespie* ruling should be limited strictly to cases closely analogous,[33] and asserting that "the distinctions thus maintained have attenuated its teaching and raised grave doubt as to whether it should longer be supported," 303 U. S. at 384–385, the Court went on to say:

"In numerous decisions we have had occasion to declare the competing principle, buttressed by the most cogent considerations, that the power to tax should not be crippled 'by extending the constitutional exemption from taxation to those subjects which fall within the general application of non-discriminatory laws, and where no direct burden is laid upon the governmental instrumentality and there is only remote, if any, influence upon the exercise of the functions of government.' *Willcuts* v. *Bunn,* 282 U. S. 216, 225, and illustrations there cited." 303 U. S. at 385.

That competing principle the Court found applicable to the case before it and to require that the decisions in the *Gillespie* and *Coronado* cases be overruled. Rejecting as insubstantial the distinction based on the passage of title to the oil at the time of making the lease, compare *Group*

---

[33] Citing *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, which the opinion characterized as "a corollary" to the *Gillespie* case. 303 U. S. at 383. The federal income tax in the *Coronado* case was levied upon the lessee of state school lands. Cf. note 32 *supra.*

*No. 1 Oil Corp.* v. *Bass, supra,* with *Burnet* v. *Coronado Oil & Gas Co., supra,* and after reviewing various other decisions denying the immunity when claimed by private persons, 303 U. S. at 385–386, the Court said:

> "These decisions in a variety of applications enforce what we deem to be the controlling view—that immunity from non-discriminatory taxation sought by a private person for his property or gains because he is engaged in operations under a government contract or lease cannot be supported by merely theoretical conceptions of interference with the functions of government. Regard must be had to substance and direct effects." 303 U. S. at 386.

## IV.

Respondents strongly urge that the *Mountain Producers* decision is not controlling or effective to require reversal in these cases, since it involved a tax on net income rather than gross production and excise taxes. And they insist that a sharp line should be drawn between what they call lessees performing a governmental function and independent contractors doing work for the Government.[34]   The latter distinction is largely, if not altogether verbal, in the context of the fact situations in these cases.   As for the former difference, although the Court explicitly overruled only the *Gillespie* and *Coro-*

---

[34] Among the cases which one or the other of respondents attempts to distinguish on the ground that the tax was imposed on an independent contractor rather than a "true Federal instrumentality" are: *James* v. *Dravo Contracting Co.,* 302 U. S. 134; *Buckstaff Co.* v. *McKinley,* 308 U. S. 358; *Alabama* v. *King & Boozer,* 314 U. S. 1; and *Wilson* v. *Cook,* 327 U. S. 474.

It is also contended that cases sustaining taxes on the property of a federal instrumentality, *e. g., Railroad Co.* v. *Peniston,* 18 Wall. 5; *Alward* v. *Johnson,* 282 U. S. 509; *Indian Territory Illuminating Oil Co.* v. *Board of Equalization,* 288 U. S. 325, are not inconsistent with the view they ask us to take.   Cf. Part I *supra.*

*nado* cases, the groundings of the *Mountain Producers* decision do not permit limiting its effects to so narrow an application.[35]

The language last quoted above is as applicable to the present cases as it was to the *Gillespie* and *Coronado* decisions. The taxes here are nondiscriminatory. The respondents are "private persons" who seek immunity "for their property or gains because they are engaged in operations under a government contract or lease." The functions they perform in operating the leases are hardly more governmental in character than those performed by lessees of school lands or, indeed, by many contractors with the Government. The lessees in the *Mountain Producers* case stood identically with the respondents in all these respects.

Moreover the burdens of the taxes here, if any of a character likely to interfere with respondents in carrying out the terms of their leases, are as appropriately to be judged by "regard . . . to substance and direct effects," and as inappropriately to be determined "by merely theoretical conceptions of interference with the functions of government," as were those in the *Mountain Producers* case.[36] True, as respondents say, a net income

---

[35] The incongruity of the doctrine respondents ask us to perpetuate is underscored by decisions subsequent to the *Mountain Producers* case withdrawing income tax immunity for state and federal official salaries. *Helvering* v. *Gerhardt*, 304 U. S. 405; *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466.

See generally, Powell, The Waning of Intergovernmental Tax Immunities, 58 Harv. L. Rev. 633; Powell, The Remnant of Intergovernmental Tax Immunities, 58 Harv. L. Rev. 757.

[36] Respondents merely assert hypothetically that imposition of the taxes might in some instances make the margin between successful and unsuccessful operation. Leases approved by the Secretary of the Interior provided for the same rental and royalty payments both before and after the *Mountain Producers* decision. 25 C. F. R. § 189.16. And rental and royalty payments provided for by the

tax may be a step farther removed from interfering effect than a gross production tax or an excise tax on production. But this all depends upon the rate at which each tax is levied.

To the adaptation of Marshall's oft-quoted aphorism made by Mr. Justice McKenna in *Indian Territory Illuminating Oil Co.* v. *Oklahoma,* 240 U. S. at 530, and followed by Mr. Justice Holmes in *Gillespie* v. *Oklahoma,* 257 U. S. at 505, namely, that "A tax upon the leases is a tax upon the power to make them, and could be used to destroy the power to make them," Chief Justice Hughes in the *Mountain Producers* case did not explicitly make the rejoinder given by Holmes in another connection, "The power to tax is not the power to destroy while this Court sits." *Panhandle Oil Co.* v. *Knox,* 277 U. S. 218, 223. But this was the effect of the *Mountain Producers* decision, when in a single paragraph it challenged both the aphorism and the assumption that "a tax upon the profits of the leases" was "a direct hamper upon the effort of the United States to make the best terms that it can for its wards."

The *Mountain Producers* case was not decided on narrow, merely technical or presumptive grounds. Its very foundation was a repudiation of those insubstantial bases for securing broad private tax exemptions, unjustified by actual interfering or destructive effects upon the performance of obligations to or work for the government, state or national. The decision came as the result of

Department of the Interior are the same for lands allotted under the General Allotment Act as they are for lands of members of the Five Civilized Tribes, 25 C. F. R. §§ 183.24, 189.16. Production from the latter lands has been subject to Oklahoma's gross production tax since 1928. See note 42 *infra.* The Government, in its brief *amicus curiae,* states that, because differences in the value of different tracts of land would be reflected in the bonuses which lessees are willing to pay, an exact comparison of bonuses is impossible.

experience and of observation of the constant widening of the exempting process from tax to tax to tax.

Since that decision, as we have noted, the process has been reversed in direction. True intergovernmental immunity remains for the most part. But, so far as concerns private persons claiming immunity for their ordinary business operations (even though in connection with governmental activities), no implied constitutional immunity can rest on the merely hypothetical interferences with governmental functions here asserted to sustain exemption. In the light of the broad groundings of the *Mountain Producers* decision and of later decisions, we cannot say that the *Gipsy Oil, Large Oil* and *Barnsdall Refineries* decisions remain immune to the effects of the *Mountain Producers* decision and others which have followed it. They "are out of harmony with correct principle," as were the *Gillespie* and *Coronado* decisions and, accordingly, they should be, and they now are, overruled. This accords with the result reached in *Santa Rita Oil Co.* v. *State Board of Equalization,* 112 Mont. 359. Moreover, since the decisions in *Choctaw, O. & G. R. Co.* v. *Harrison, supra,* and *Indian Territory Illuminating Oil Co.* v. *Oklahoma, supra,* rest upon the same foundations as those underlying the *Gipsy Oil, Large Oil* and *Barnsdall Refineries* decisions, indeed supplied those foundations, we think they too should be, and they now are, overruled.

We do not imply, by this decision, that Congress does not have power to immunize these lessees from the taxes we think the Constitution permits Oklahoma to impose in the absence of such action.[37] The question whether immunity shall be extended in situations like these is

---

[37] See *James* v. *Dravo Contracting Co.,* 302 U. S. 134, 160–161; *Pittman* v. *Home Owners Corp.,* 308 U. S. 21, 32–33; *Maricopa County* v. *Valley Bank,* 318 U. S. 357, 361; *Board of Commissioners*

essentially legislative in character. But Congress has not created an immunity here by affirmative action,[38] and "The immunity formerly said to rest on constitutional implication cannot now be resurrected in the form of statutory implication." *Oklahoma Tax Commission* v. *United States,* 319 U. S. 598, 604. And see *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, 480: ". . . if it appears that there is no ground for implying a constitutional immunity, there is equally a want of any ground for assuming any purpose on the part of Congress to create an immunity."

The Oklahoma Supreme Court appears to suggest, though the opinions do not flatly so state, as a possible alternative support for its conclusion in these cases that "Congress has acted on the theory that such immunity exists in the case of leases of this character unless waived," that is, several congressional enactments permit Oklahoma to impose a gross production tax on minerals produced from the lands of the Osages,[39] the Kaws,[40] the Quapaws,[41] and the Five Civilized Tribes,[42] and authorize payment of taxes due on account of the Indians' royalty interest. But Congress' purpose in enacting these statutes was the removal of the immunities of the Indians themselves, immunities which are not challenged in these cases; the action was occasioned by the favorable eco-

---

v. *Seber,* 318 U. S. 705, 715–719; *Oklahoma Tax Commission* v. *United States,* 319 U. S. 598, 606–607; *Mayo* v. *United States,* 319 U. S. 441, 446; *Smith* v. *Davis,* 323 U. S. 111, 116–119.

[38] See Cohen, *op. cit. supra* note 5, at 255–256.

[39] 41 Stat. 1250. As has been stated, *Oklahoma* v. *Barnsdall Refineries,* 296 U. S. 521, held that this statute did not authorize the imposition of the state's petroleum excise tax. See text at note 30 *supra.*

[40] 43 Stat. 176.

[41] 41 Stat. 1248, as amended, 50 Stat. 68.

[42] 45 Stat. 496.

nomic position of the particular Indians.[43]   The resulting removal of the immunity of private lessees of those Indian lands was an incidental effect of this legislation.

Finally, we refuse to infer from mere congressional silence approval of the doctrine of immunity enunciated in the *Choctaw, O. & G. R. Co.*, *Indian Territory Illuminating Oil* (240 U. S. 522), *Gipsy Oil, Large Oil* and *Barnsdall Refineries* decisions, *supra.*   Congress' silence prior to the *Mountain Producers* decision did not preclude this Court from curtailing the lessee's immunity in that case; and Congress seems to have accepted that decision with equanimity.   Cf. *Girouard* v. *United States,* 328 U. S. 61, 69–70; *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, 479–480.[44]

*Reversed and remanded.*

MR. JUSTICE JACKSON concurs in the result.

---

[43] H. R. Rep. No. 1377, 66th Cong., 3d Sess. 4; H. R. Rep. No. 1278, 66th Cong., 3d Sess. 2–3; S. Rep. No. 704, 66th Cong., 3d Sess. 3 (all relating to the Osage Act, note 39 *supra*); H. R. Rep. No. 269, 68th Cong., 1st Sess. 3; S. Rep. No. 433, 68th Cong., 1st Sess. 3 (both relating to the Kaw Act, note 40 *supra*); H. R. Rep. No. 431, 75th Cong., 1st Sess.; S. Rep. No. 234, 75th Cong., 1st Sess. 2 (both relating to the Quapaw Act, note 41 *supra*); H. R. Rep. No. 1193, 70th Cong., 1st Sess. 5; S. Rep. No. 982, 70th Cong., 1st Sess. 4–5 (both relating to the Five Civilized Tribes Act, note 42 *supra*).

[44] Respondents also urge that the Oklahoma legislature has recognized the immunity they assert here by authorizing the refund of "payment made in error on account of the production being derived from restricted Indian lands and therefore exempt from taxation." 68 Okla. Stat. § 832 (1941). Although respondents tell us that this argument was urged upon the Oklahoma Supreme Court, that court did not mention this possible state ground but rested its decision exclusively on the federal ground. We do not purport to decide whether Oklahoma law affords the exemption which federal law denies.

See note 4 as to the assessments attributable to the undivided interests in lands held by non-Indians in No. 41.