**APACHE GAS PRODUCTS CORPORATION
et al., Appellants,**

**v.**

**OKLAHOMA TAX COMMISSION,
Appellee.**

**No. 42841.**

Supreme Court of Oklahoma.

March 27, 1973.

Rehearing Denied May 1, 1973.

George H. Bowen, Tulsa, for appellants.

Albert D. Lynn, E. J. Armstrong, R. O. Ingle, Sallisaw, for appellee.

BARNES, Justice:

This appeal involves the interpretation and application of the emphasized provisions of that part of this State's Gross Production Tax Law, 68 O.S.1961, § 833, appearing as Title 68 O.S.1971, § 1009, quoted below:

"(a) The gross production tax on . . . natural gas . . . shall be paid on a monthly basis in accordance with this Article.

\*     \*     \*     \*     \*     \*

"(f) *In case . . . gas . . . is sold under circumstances where the sale price does not represent the cash price thereof prevailing for . . . gas . . . of like kind, character or quality in the field from which such product is produced, the Tax Commission may require the said tax to . . . (b) paid upon the basis of the prevailing price then being paid at the time of production thereof in said field for . . . gas . . . of like kind, quality and character."* (Emphasis supplied)

For several years the Appellants, Apache Gas Products Corporation and Warren Petroleum Corporation, have been purchasing from the Appellant, R. H. Siegfried, Inc., natural gas which the latter produces on oil and gas leases in Lincoln County. These parties will hereinafter be referred to collectively as "plaintiffs" and individually by the first word in their names. The Appellee, Oklahoma Tax Commission, will hereinafter be referred to as "defendant" and/or "Commission".

For years previous to April, 1963, Apache and Warren reported to the Commission, as prescribed by 68 O.S.1961, § 834, the gas they purchased from Siegfried and other producers in Lincoln County under written contracts previously entered into with those producers; and they remitted to the Commission the gross production tax upon the quantity of gas shown on these reports computed on the basis of the prices prescribed for it by the contracts. The gas Apache and Warren were purchasing from Siegfried at the time this controversy arose had insufficient pressure to enter the pipeline of the common carrier in that area (hereinafter referred to as "Oklahoma Natural") and consequently, under the provisions of their contracts, they obtained it for the price of 9¢ per MCF at the wells where and as produced.

On April 19, 1963, the Commission, through its Gross Production Division's Director, addressed a letter to Apache enclosing a statement of additional gross production taxes it was claiming on this gas for the period August 1, 1960, to February

28, 1963, and advising Apache that in accord with the statement (which was the result of an audit the Commission had made) it owed additional gross production taxes in the amount of $4,806.68, with an additional sum of interest. The letter informed Apache that in computing the Company's liability, the Commission "intended to use, and used as a measuring device, the prevailing price of gas in the field or area from which the gas was produced, which price the Tax Commission understands is 12¢ per MCF. * * *"

Thereafter, Apache and Warren paid, under protest, the additional tax assessment, which with interest and penalty totaled $8,084.72, and then instituted the present action for its recovery. Plaintiffs attached to their petition a copy of a contract representing the terms under which they had been purchasing the gas. One provision of the contract prescribed a price of 11¢ per MCF for gas delivered to the purchaser at a pressure sufficient to enter Oklahoma Natural's high pressure line at the plant where it was to be used, *but another price of only 9¢ per MCF for gas delivered into the plant's low pressure system.* Plaintiffs' petition alleged that this contract and all others governing the price they had paid for the gas in question were "negotiated at arm's length between the contracting parties in good faith and for the best price and on the best terms the sellers could secure." Plaintiffs' theory was that since the lower of the above contract's prescribed prices (9¢) was the price they had paid for the gas in question, that it was the only price upon which the gross production tax could be lawfully computed. They alleged that the higher price of 12¢ per MCF, the Commission had used in its computation, was "a false and fictitious basis", arbitrarily and unlawfully fixed by the Commission, for evaluation of the gas.

Plaintiffs further alleged that the Commission's long continued uniform previous practice of assessing and collecting gross production taxes upon gas values, determined by contract sale price, constituted an administrative interpretation of the intent and meaning of the applicable tax statutes, that had become binding on said defendant. Plaintiffs further alleged that payment of the tax, calculated by the new method the Commission had used in this instance, resulted in an attempted application of the law that was neither equal nor uniform and was in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article 10, Section 5, of the Oklahoma Constitution.

In its answer, the Commission denied (among other allegations of plaintiffs' petition) that the contract price plaintiffs paid for the gas was the equivalent of the "gross value" for use in determining the gross production tax payable, or represented the proper or lawful basis for evaluating the gas for gross production tax purposes. It prayed that plaintiffs take nothing by the action and be required to pay the costs thereof.

After one trial and a judgment for plaintiffs, the trial court sustained defendant's motion for a new trial, and, after a further hearing of it, took the case under advisement and thereafter entered judgment for the defendant sustaining the "deficiency assessment" of gross production taxes it had previously made, as hereinbefore indicated. In so ruling, the Court concluded that the gross production tax is based upon "gross value", instead of cash value. Despite its finding that the contracts under which Apache and Warren had purchased the gas from Siegfried and others were negotiated "at arm's length" and that the price paid for it was "the highest and best price obtainable for natural gas in that field, under the circumstances prevailing", the Court concluded that the Commission, in determining its "gross value" for gross production tax purposes, was not bound by that price, but was "authorized by law to fix . . . (said) gross value by determining the prevailing price of gas in the field" and that said "prevailing price . . .", as ascer-

tained by defendant, was "supported by the evidence." The Court further found that the Commission's administrative finding that 12¢ per MCF was the "prevailing price" of the gas—using all of Lincoln County as the "field" involved—was based upon a chart said defendant introduced in evidence as its Exhibit 6, showing that 55% of the gas produced and sold in that County brought that price.

After the overruling of a second motion for a new trial filed by plaintiffs, they perfected the present appeal.

In their urging of errors in the trial court's judgment, plaintiffs present arguments concerning other issues, but we think the errors in said judgment are rendered manifest by considering defendant's above mentioned Exhibit 6 and correctly interpreting the applicable statutory provisions.

Defendant's Exhibit 6 consisted of a written tabulation made in its Gross Production Division showing the volumes of gas that four purchasers, including Apache, had bought and paid for natural gas they had purchased in the whole of Lincoln County at certain varying prices during the months of January in each of the years 1961, 1962 and 1963. The figures on this Exhibit (never disputed) indicated that of the total of such Lincoln County gas sold during those three months the sale price of slightly more than 55% was 12¢ per MCF, while less than 2% of that total volume sold for 9¢ per MCF. However, uncontradicted evidence, both testimony and documents (including the contracts under which Apache purchased its gas), indicated that several factors, including its pressure, affect the marketability and price of natural gas in a given field or locality, and that gas below a certain pressure level brings a lower price than gas with a pressure above that level.

Defendant's Exhibit 6 showed neither the pressure nor any other price-affecting characteristic of the volumes of gas in the various price categories shown thereon. Nor did it reflect the dates of the contracts under which the varying-priced gas sales were made. Broadly speaking, none of the evidence clearly established whether any of the gas prices shown on defendant's Exhibit 6 did or did not represent the "cash price" that prevailed in Lincoln County for natural gas "of like kind, character or quality" *at the time the contracts prescribing those prices were entered into.* That the trial court adopted the Commission's view that this was not necessary and that under Section 1009(f), supra, the Commission may ignore contract price and levy a gross production tax on the basis of the prevailing price of the gas *at the time it is produced* may be indicated by the court's (unchallenged) finding that the price paid for the gas (at which the subject deficiency assessment was directed) was "the highest and best price obtainable for gas in that field, under the circumstances prevailing . . .". The trial court's findings and judgment could only have resulted from an interpretation of our Gross Production Tax Law, which, in our view, is erroneous.

It has never been suggested that long term contracts in the natural gas distribution business are unnecessary, or that the prevailing market price at the time such contracts are entered into may not later be exceeded by the prevailing market price of identical gas at another time and place. If, as never negated by the evidence in this case, the prevailing market price of gas in a certain field may increase during the life of a long term gas purchase contract, it is not surprising that purchasers like Apache and Warren, whose contracts were made several years before 1961, 1962 and 1963, purchased gas under them during those years at prices below those paid by purchasers whose contracts were entered into later. In this situation, does the Commission have the authority to place the same gross value on the gas being purchased under the earlier contracts as a larger volume of gas purchased under later contracts, if the earlier contracts prescribed the highest prices that were obtain-

able under the circumstances at the time they were entered into? We think this question must be answered in the negative. In our opinion, the wording of Section 1009(f), when interpreted in the light of the realities of the natural gas industry (such as necessity for long term contracts, necessary time lag between initial, and later, sales under such contracts, and inevitable effect of increased demand, during such contract periods, upon current or prevailing gas prices generally) can only mean that the Commission "may require" the tax to be paid on the basis of prevailing price in the field *at the time of production* ONLY *in cases where the prices (already) paid are less than the prices that prevailed in the field at the time said sale prices were contracted for.*

As indicated, natural gas, unlike oil, is not ordinarily produced and then stored to await sale and delivery, during which period a "prevailing price" may attach, or be made applicable, to it. Since natural gas is most economically and usually sold and delivered at the time it is produced or withdrawn from the ground, it would be impractical, and difficult, if not impossible, to fix, or to ascertain, its prevailing price at the moment or "time of production". Under the circumstances, its sale price must be agreed upon at another time—usually many years before its delivery, and generally under long term contracts.

The Commission erred in basing its subject deficiency assessment on what it understood to be the price at which (its records indicated) the largest volume of Lincoln County gas had sold during the years 1961, 1962 and 1963, without regard to prevailing field prices at the time the purchase of the gas (sought to be additionally assessed) was contracted for. As there was no evidence that 12¢ per MCF represented, or was the equivalent of, that price, or that the 9¢ per MCF, which Apache and Warren paid for the subject gas, was less than that price, the trial court's judgment upholding the deficiency assessment is contrary to law and lacks sufficient evidence to support it.

W. R. Davis, Inc. v. State 142 Tex. 637, 180 S.W.2d 429, involved the Texas counterpart of our Gross Production Tax Act. There the Court demonstrated logical support for its view that "the good faith price" of natural gas is the standard on which the Texas tax "must be computed" by recognizing that, under a portion of the Texas Act similar to the Oklahoma Act's Section 833 (1961), or 1009(d) (1971), the purchaser collects the tax from the producer by deducting its amount from the purchase price of the gas, and then saying (180 S.W.2d p. 432):

> "* * * Certainly this portion of the Act does not contemplate that the purchaser shall pay the producer one price, deduct the tax due the State at that price . . . and then pay the State a tax at another price."

We think the same reasoning applies to the Oklahoma Act and furnishes support for its interpretation as herein indicated.

The Commission asserts that Article X, § 5, of the Oklahoma Constitution requires that the tax be "uniform upon the same class of subjects". The Commission assumes, without demonstration, that for the tax to be "uniform" the "cash price" upon which the tax is computed must be "uniform" as to all producers in the field. This premise is false. Article X, § 22, specifically provides that: "Nothing in this Constitution shall be held, or construed, to prevent the classifictaion of property for purposes of taxation; and the valuation of different classes by different means or methods". Obviously, one basis of classification would be the variant circumstances affecting the propriety of a particular price, and certainly various classifications are entitled to be valued by different means or methods. It is only upon the same "class of subjects" that taxes must be uniform (Art. X, § 5, supra), so that, once the propriety of classification is accepted, there is no problem respecting lack of uniformity.

Despite what has been said in some past decisions, the gross production tax is *not* a property tax. By express terms, it is a tax

"in lieu of" property taxes by the State and its subdivisions upon various kinds of property rights, real and personal, in connection with the exercise of mining rights, and upon the gas itself during the tax year in which produced. "In lieu of" means "in substitution for", not "the same as"; just as a lieutenant is a subordinate officer acting in place of his superior and not "the same as" his superior. The early decisions of this Court correctly recognized the tax not to be a property tax but an excise, in lieu of property, and certain other, taxes. See In re Gross Production Tax of Wolverine Oil Co., 53 Okl. 24, 154 P. 362, 364, 365, 366, in which this Court said:

> " * * * The fact that the present act makes the tax levied in lieu of any other method of taxing the same does not, of course, of itself, constitute the tax a tax upon the property of those engaged in the production of oil or gas. * * * The tax is not levied by assessment or upon estimate of the amount of taxes required to be levied; neither is it on account of property owned on a given day. * * * If there be no production, regardless of the value of the property, no tax is authorized. In short, the tax is one levied on the occupation or business; the standard adopted for the determination of its amount being the value of the gross production of the commodity taxed.
>
> \*       \*       \*       \*       \*       \*
>
> "As to those liable to and who pay a gross production tax, it will be noted that the act does not in terms exempt equipment and machinery, but provides that the payment of the gross production tax shall be in lieu of any other tax that might be levied and collected on said property upon an ad valorem basis. This is not an exemption from taxation within the meaning of the constitutional inhibitions, *but a substitution of one form of taxation for another upon the terms and conditions named.* * * * "
> (Emphasis supplied)

The erosion of this sound exposition started when this Court, concerned over the possible invalidity of the tax as applied to production from Indian or federally owned leases, felt that it was necessary to justify the tax as other than an occupation tax on the producer's business. The only possible way to accomplish this, which the judges seemed able to recognize, was to identify the gross production tax as a property tax, subject to all the limitations on a property tax. In re Skelton Lead & Zinc Company's Gross Production Tax for 1919, 81 Okl. 134, 197 P. 495 (1921), is the leading case, although it was preceded by a partial recantation by Sharp, J., of his prior position in Wolverine, to the extent of stating at one point that "the act in fact imposes a 'property tax', that is, a tax upon the gross value of the oil and gas produced during the preceding quarter-annual period, less the royalty interest." 163 P., at 540. However, Justice Sharp also emphasized the true character of the exaction as an "in lieu" tax, rather than a property tax, by concluding:

> "While the tax is based on the gross value of the production, and is therefore, in a sense, an ad valorem tax, as distinguished from a specific tax, it is not, however, a tax levied on an ad valorem basis within the meaning, and subject to the limitations of section 9, art. 10 of the Constitution. The act imposes a special tax *in lieu of and as a substitute for* the general ad valorem tax on the oil and gas and the property of the producer used in the production thereof, and is levied by the Legislature in the exercise of its constitutional power to select property for the purposes of taxation, and to value and classify such property by means and methods differing from that commonly employed in the assessment, levy, and collection of taxes by counties and other municipal authorities." (Emphasis supplied) Large Oil Co. v. Howard, 63 Okl. 143, 163 P. 537, 548 (1917).

■ Mr. Chief Justice Harrison, however, would have none of this "in lieu"

and "substitute" foolishness. In the Skelton opinion, supra, he bore down repeatedly on the theme that "the Legislature had no other object than *to levy a property tax* upon mining property according to its fair cash value, using the measure therein adopted for ascertaining such value, and providing the means therein provided for correcting any mistakes which might result from overvaluation or excessive rate." 197 P., at 497. He wrote (p. 498):

> "Therefore we cannot sustain the contention that this is any other than a property tax."

And then he "let the cat out of the bag" by announcing a paragraph later:

> " * * * The only plausible reason we see for contending that it is an occupation tax is that if it is such a tax, the leasing of restricted lands being a federal instrumentality, then the state has no power to levy such a tax upon the privilege of exercising a federal instrumentality."

The whole purpose of the opinion was to avoid the immunity of mineral operators under federal leases. In pursuit of this goal, the Chief Justice went so far as to deny that an occupation tax was an exercise of taxing power at all, being, instead, referable solely to the police or regulatory power of government. Such a position, of course, is patently erroneous, under the great weight of authority, including Oklahoma, (Oklahoma Tax Commission v. Sisters of the Sorrowful Mother, 186 Okl. 339, 97 P.2d 888; Ex parte Dickison, 138 Okl. 266, 280 P. 797; Crawford v. Town of Marshall, 158 Okl. 167, 12 P.2d 875; Ex parte Marler, 140 Okl. 194, 282 P. 353), and, by specific provision of our Constitution, Article X, § 12:

> "The Legislature shall have power to provide for the levy and collection of license, franchise, gross revenue . . . taxes; . . . also . . . production or other specific taxes."

The doctrine of Skelton was reaffirmed and Wolverine was specifically overruled in Bergin Oil & Gas Co. v. Howard, 82 Okl. 176, 199 P. 209.

It is from this insistence upon the nature of the gross production tax as entirely a property, and not an in lieu, tax that the notion of the necessity of uniformity under Article X, § 5, of the Constitution, and of *one* uniform "prevailing field price" seems to have derived.

The hope that inspired the intellectual gymnastics of the above cases was early blighted. The federal immunity doctrine was held applicable to the gross production tax, despite Oklahoma's change in proclaimed theory. See Large Oil Co. v. Howard, 248 U.S. 549, 39 S.Ct. 183, 63 L. Ed. 416 (1919); Howard v. Indian Territory Illuminating Oil Co., 247 U.S. 503, 38 S.Ct. 426, 62 L.Ed. 1239 (1917); Gillespie v. Oklahoma, 257 U.S. 501, 42 S.Ct. 171, 66 L.Ed. 338 (1922); Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 52 S.Ct. 443, 76 L.Ed. 815 (1932). Some relief was obtained through congressional enabling legislation, so far as application to Indian land was concerned. See Oklahoma ex rel. Oklahoma Tax Commission v. Barnsdall Refineries, Inc., 296 U.S. 521, 56 S.Ct. 340, 80 L.Ed. 366 (1936). Finally, the Supreme Court of the United States struck down the whole immunity doctrine in Helvering v. Mountain Producers Corporation, 303 U.S. 376, 58 S.Ct. 623, 82 L.Ed. 907 (1938), and Oklahoma Tax Commission v. Texas Co., 336 U.S. 342, 69 S.Ct. 561, 93 L.Ed. 721 (1948). The latter decision also obliterated the supposed distinction between property taxes and excise taxes, in the application of the immunity doctrine. Since the reasons which motivated the detour from the correct interpretation of the gross production tax, and its subjection to a supposed constitutional requirement of uniformity, no longer exist, this Court has no hesitance in overruling these erroneous decisions and in returning to the original doctrine. Oklahoma County v. Queen City Lodge No. 197, 195 Okl. 131, 156 P.2d 340 (1945).

It also should be remembered that an "in lieu tax" does not have to conform exactly to the tax which it replaces. See Galveston, H. & S. A. Ry. Co. v. Texas, 210 U.S. 217, 28 S.Ct. 638, 52 L.Ed. 1031 (1908); Cf. Hope Nat. Gas Co. v. Hall, 274 U.S. 284, 47 S.Ct. 639, 71 L.Ed. 1049 (1927), (as to the excise tax theory).

We have held that: "The long-continued construction of statutory provisions by a department of government charged with their execution is entitled to great weight and should not be overturned without cogent reasons; and where the Legislature has convened many times during this period of administrative construction without expressing its disapproval, such silence may be regarded as acquiescence in or approval of the administrative construction." D. L. Peterson v. Oklahoma Tax Commission, Okl., 395 P.2d 388 (syll. 1).

In view of the foregoing, the order and/or judgment appealed from, overruling plaintiffs' motion for a new trial, is hereby reversed, and this cause is remanded to the trial court with directions to enter judgment for plaintiffs vacating the order of the Tax Commission and directing said Commission to repay plaintiffs the sum or sums they have heretofore paid the Commission under protest, plus interest.

In future applications of the statute here involved, the Commission should apply the gross production tax to the gross proceeds realized by each producer from his individual sales contracts, except where the conditions under which a particular contract was entered into were such as not to reflect arm's length bargaining or as not to be a reasonably prudent exercise of such bargaining, resulting in an improper burden upon the public revenue by a price not representing "gross value of the production of natural gas." Where the Commission finds such exceptions to exist, it should make a proper adjustment of the tax to conform to the "prevailing price in the field at the time of production." The "field" need not be county-wide. It should be equated with "common source of sup-

ply" as that term is used and understood in the oil and gas industry. The field's identity and extent obviously must be a matter to be determined in each case. Payments of the tax should be obtained from the producer of the gas or from its purchaser out of the producer's interest therein.

WILLIAMS, V. C. J., and BERRY, HODGES, SIMMS and DOOLIN, JJ., concur.

DAVISON, C. J., and IRWIN and LAVENDER, JJ., dissent.